**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION**

KENNETH BOATRIGHT,

      Plaintiff,

v.

DISCOUNT AUTO PARTS, LLC., and
ENERGIZER HOLDINGS, INC.,

      Defendants.

Civil Action No.
5:24-CV-58

**DEFENDANT ENERGIZER HOLDINGS, INC.'S MOTION TO EXCLUDE
OPINIONS OF PLAINTIFF'S EXPERT SCOTT C. BIONDICH**

Defendant Energizer Holdings, Inc. ("Energizer") moves this Court to exclude

the opinions proffered by Plaintiff Kenneth Boatright's retained expert witness, Scott

C. Biondich.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the

Supreme Court concluded that Federal Rule of Evidence 702 "compels the district

courts to perform the critical 'gatekeeping' function concerning the admissibility of

expert scientific evidence." *See United States v. Frazier*, 387 F.3d 1244, 1260 (11th

Cir. 2004) (citing *Daubert*, 509 U.S. at 589 n.7, 597). The Court later explained that

"*Daubert's* general holding—setting forth the trial judge's general 'gatekeeping'

obligation—applies not only to testimony based on 'scientific' knowledge, but also to

testimony based on 'technical' and 'other specialized' knowledge." *See Kumho Tire Co.*

*v. Carmichael*, 526 U.S. 137, 141 (1999) (citing Fed R. Evid. 702). Incorporating these

decisions, Rule 702 provides as follows:

1

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

*See* Fed. R. Evid. 702.

The Eleventh Circuit applies a three-pronged inquiry to determine whether an expert's testimony complies with Rule 702 and *Daubert*. The Court must determine whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*See Frazier*, 387 F.3d at 1260. The proponent of the expert opinion bears the burden of establishing qualification, reliability, and helpfulness by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10.

For the first prong, "experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." *See Frazier*, 387 F.3d at 1260–61; *see also* Fed. R. Evid. 702 (a witness may be qualified as an expert by "knowledge, skill, experience, training, or education[.]"). As to the second prong, the reliability "criterion remains a discrete, independent, and important requirement for admissibility." *See Frazier*, 387 F.3d at 1261. The Supreme Court in *Daubert* "set out a list of 'general observations'

for determining whether expert testimony is sufficiently reliable to be admitted under Rule 702." *See United States v. Brown*, 415 F.3d 1257, 1267 (11th Cir. 2005). These factors or observations inquire into the expert's "theory or technique" and are: "(1) whether it can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) what its known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether it is generally accepted in the field." *Id.* "Sometimes the specific *Daubert* factors will aid in determining reliability; sometimes other questions may be more useful." *See Frazier*, 387 F.3d at 1262. "Indeed, the Committee Note to the 2000 Amendments to Rule 702 expressly says that, '[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Id.* at 1261. Finally, expert opinion testimony must assist the trier of fact. *Id.* at 1262. "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Id.*

While the inquiry is "a flexible one," the focus "must be solely on principles and methodology, not on the conclusions that they generate." *See Daubert*, 509 U.S. at 594–95; *see also McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004). "But conclusions and methodology are not entirely distinct from one another;" neither *Daubert* nor Rule 702 requires a trial judge to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Instead, the trial court is "free to conclude that there is

simply too great an analytical gap between the data and the opinion proffered." *See Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010); *see also McDowell*, 392 F.3d at 1299 (noting "there is no fit where a large analytical leap must be made between the facts and the opinion," such as proffering animal studies concerning a type of cancer in mice to establish a different cancer in humans). The Court has "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *See Daubert*, 509 U.S. at 597.

As gatekeeper for the expert evidence presented to the jury, the Court "must do a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *See Kilpatrick v. Berg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010). It is "proper" and "necessary" for the Court to "focus on the reliability of a proffered expert's "sources and methods." *Id.* at 1336. Under *Daubert*, the "district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1316–17 (11th Cir. 1999).

Plaintiff's liability expert, Scott Biondich, has submitted a report which outlines 22 different "conclusions." *See* doc. 46 at 25–26. The vast majority of these "conclusions" are factual assertions of which Mr. Biondich has no firsthand knowledge, consist of commentary on discovery in the lawsuit and documents produced by the parties, or are flat out wrong. In his deposition, Mr. Biondich

admitted that many of these "conclusions" are not opinions. Thus, Energizer requests

that the following "conclusions" be excluded from use as expert opinions.

| "Conclusion" | Reason to Be Excluded |
|---|---|
| A can of EZ Chill unexpectedly and catastrophically exploded while Mr. Boatright was simply holding the can in his right hand. | Admitted that this assertion should not treated as an opinion in his deposition. *See* Exhibit 1, Deposition of Scott Biondich, at 111:16–111:22 |
| The can that failed was provided by the Advanced [sic] Auto Parts store manager. | Factual assertion of which Mr. Biondich has no firsthand knowledge. |
| The fit of the can onto Mr. Boatright's vehicle was determined to be good by the Advanced [sic] Auto Parts store manager and the pressure after dispensing half the contents was determined to be good (by the store manager). Approximately half of the can's contents were emptied into Mr. Boatright's vehicle. | Factual assertion of which Mr. Biondich has no firsthand knowledge. Admitted that it should not be treated as an opinion in his deposition. *See* Ex. 1, Biondich Dep., at 110:5–110:24. |
| The Advanced [sic] Auto Parts store manager witnessed the catastrophic and unexpected can failure. | Admitted that this assertion should not be treated as an opinion in his deposition. *See* Ex. 1, Biondich Dep., at 109:18–109:23 |
| Both the front and back of Mr. Boatright's hands were injured when the EZ Chill can violently failed as evidenced by photos of his hands and the Advanced [sic] Auto Parts Incident Report. | Admitted that this assertion should not be treated as an opinion in his deposition. *See* Ex. 1, Biondich Dep., at 110:25–111:7. |
| The explosion of the can was so forceful, it caused the coupler and hose to separate from the EZ Chill can and for the whole can body to tear apart. | Admitted that this assertion should not be treated as an opinion in his deposition. *See* Ex. 1, Biondich Dep., at 111:8–111:15. |
| The can was manufactured under two special permits issued by the U.S. Department of Transportation. These were DOT-SP 10232 and DOT-SP 14188. Two aspects of DOT-SP 14188 relate to the metal container to be "conforming to Interdynamics Incorporated drawing numbers ID-LC-001 and ID-LC-001.1b and having minimum thickness of 0.019 inch and 0.011 inch for aluminum and | Admitted that this assertion should not be treated as an opinion in his deposition. *See* Ex. 1, Biondich Dep., at 111:23–112:15. |

5

| | |
|---|---|
| steel respectively. These drawings were requested and not received. | |
| The can contained a pressure relief device (PRD) in the center of the can bottom. The PRD is covered by patent US 8,967,411. This patent number was printed on the side of the can. | Admitted that this assertion should not be treated as an opinion in his deposition. *See* Ex. 1, Biondich Dep., at 113:10–113:18. |
| The most pertinent drawings, specifications, and test data were NOT provided by the Defendant. | Admitted that this assertion should not be treated as an opinion in his deposition. *See* Ex. 1, Biondich Dep., at 113:19–114:19. |
| The most pertinent data was requested and was NOT provided by the Defendant. | Admitted that this assertion should not be treated as an opinion in his deposition. *See* Ex. 1, Biondich Dep., at 114:10–114:19. |
| The data provided by the Defendant was limited and had small sample sizes. | Admitted that this assertion should not be treated as an opinion in his deposition. *See* Ex. 1, Biondich Dep., at 114:20–114:25. |
| Data was not provided for the type of testers used or when the testers were calibrated. Thus, one cannot determine if the testers used were appropriate for the application or if the value shown on the tester was believable. | Admitted that this assertion should not be treated as an opinion in his deposition. *See* Ex. 1, Biondich Dep., at 116:1–116:7. |
| No SPC charts were provided for critical data either. Thus one cannot ascertain if their process was in control and capable. | Admitted that this assertion should not be treated as an opinion in his deposition. *See* Ex. 1, Biondich Dep., at 115:10–115:25. |
| Many data points were not in specification. | Admitted that this assertion did not bear on the opinions formulated in this case in his deposition. *See* Ex. 1, Biondich Dep., at 115:1–115:6. |
| The can was manufactured with a Pressure relief device (PRD) in the bottom. The purpose of the PRD is to activate prior to the can bursting and thus prevent a violent failure. It is critical to understand the can is designed so the PRD fails FIRST. | Admitted that this assertion should not be treated as an opinion in his deposition. *See* Ex. 1, Biondich Dep., at 116:8–116:16. |
| The PRD is designed to activate at a minimum internal pressure of 380 PSIG and below the burst pressure of the can without a PRD (a can without a PRD | Admitted that this assertion should not be treated as an opinion in his deposition. *See* Ex. 1, Biondich Dep., at 116:17–116:25. |

| | |
|---|---|
| must hold 480 PSIG minimum). Thus the can is not supposed to burst or violently rupture until the pressure is 100 PSIG greater than the pressure at which the PRD activates. | |

What is left are the actual opinions Mr. Biondich has offered in this case, which pertain to two purported defects in the can housing the product at issue. Specifically, Mr. Biondich contends that (1) the "double seam" in the can was defective due to the amount of metal that pulled out of it; and (2) alternatively, that the pressure relief device on the bottom of the can was defective because it failed to actuate. *See generally* doc. 46 at 25–26.[1] Applying the *Daubert* framework discussed above, these opinions should be excluded.

These opinions should be excluded primarily because neither the product specifications for the can at issue—the objective standard against which a defect might be measured—nor quality control documents reflecting compliance with the same, are in the record in this case. *See* Ex. 1, Biondich Dep., at 61:25–65:8, 101:16–103:1. Mr. Biondich characterizes this information as "the data that is most important to this case." *Id.* at 102:16–103:1[2] As far as Mr. Biondich is concerned, that is likely true. Because Plaintiff has not procured these documents from the

---

[1] Mr. Biondich also offers conclusory opinions that the can was defective. These are subsumed by his opinions as to the specific purported defects.

[2] At Mr. Biondich's deposition, this line of questioning culminated in a telling exchange:

Q: You would agree with me that you have not reviewed the data that is most important to this case?

A: Correct. Because I asked for it and it wasn't provided.

7

manufacturer of the can at issue, Mr. Biondich has not reviewed any of the underlying manufacturing data, quality control data, or product specifications that are essential to formulating an admissible opinion. *Id.* at 101:16–103:1.

Lacking functionally any data to support his opinions, Mr. Biondich's methodology is already under serious scrutiny to survive the second *Daubert* prong. A look at the record reveals that Mr. Biondich employed no methodology at all. The extent of his testing on the can at issue consisted of (1) a visual examination; (2) measuring the gauge of the can; and (3) having a CT scan conducted on the can, from which Mr. Biondich was unable to derive any information. *Id.* at 118:9–119:11, 124:19–125:8. How Mr. Biondich's methodology informed the opinions he seeks to express in this case is not altogether clear. For instance, Mr. Biondich opines that the can was "defective" due to the "length of metal that pulled out of" the can's double seam. *Id.* at 123:5–125:15. But by Mr. Biondich's own admission, there is no standard in the record to compare this against and "nobody can say exactly how much metal should pull out and shouldn't pull out." *Id.* at 125:2–125:11. Mr. Biondich did not include a measurement of the length of metal that he observed because he did not believe it to be important. *Id.* And instead of any discernable criteria, or conducting any testing relating to the double seam, Mr. Biondich testified that he just "know[s] what those failures look like." *Id.* at 125:12–125:15.

Mr. Biondich's opinions relating to the pressure relief device fare little better. He testified that the pressure relief device in the can (which is not manufactured by Energizer) was defective because, theoretically, it did not actuate if the can was over

pressurized. *Id.* at 119:12–119:24. While there *is* an objective criterion against which to measure the performance of the pressure relief device—per a Department of Transportation Special Permit[3] governing the Subject Product, the pressure relief device should activate if Pressure per Square Inch Gauge ("PSIG") rises above 380— Mr. Biondich did not do anything to measure against this standard. He conducted no testing to determine at what PSIG the can failed and even remarked that the "the actual pressure it failed at is irrelevant." *Id.* at 88:13–88:21. In Mr. Biondich's view, the fact that the can burst is all the evidence needed to support his opinion. *Id.* at 87:13–88:12.

These proclamations are *ipse dixit*, not the result of accepted scientific methodology. Mr. Biondich performed little to no testing on the can, did not provide any calculations to support his opinions, and his testimony is not based on sufficient facts and data. Rather, his substantive opinions reduce to little more than "the product failed; thus, the product must have been defective." There remains a tremendous analytical gap between Mr. Biondich's observation that a significant portion of metal came out of the double seam and that the pressure relief device did not activate and his opinion that the can was defectively manufactured. *Cf. Bodner v. Thunderbird Prods. Corp.*, No. 22-11179, 2023 WL 1860968, at *3 (11th Cir. Feb. 9, 2023). The only explanation that Mr. Biondich offers to bridge that gap is his say-so. That sort of "expert evidence" is precisely the type meant to be excluded by

---

[3] *See* doc. 46 at 25–26.

*Daubert* and its progeny. *See Hendrix,* 609 F.3d at 1203. As such, Energizer requests

that this Court exclude Mr. Biondich's opinions in full.

Submitted this eighth day of June, 2026.

OLIVER MANER LLP

| | |
|---|---|
| P.O. Box 10186 | ***s/ Ben T. Tuten*** |
| Savannah, Georgia 31402 | PATRICK T. O'CONNOR |
| (P) 912 236-3311 | Georgia Bar No. 548425 |
| (F) 912 236-8725 | PAUL H. THRELKELD |
| pto@olivermaner.com | Georgia Bar No. 710731 |
| pht@olivermaner.com | BEN T. TUTEN |
| btuten@olivermaner.com | Georgia Bar No. 299110 |

***Attorneys for Energizer Holdings, Inc.***

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

Submitted this eighth day of June, 2026.

OLIVER MANER LLP

P.O. Box 10186
Savannah, Georgia 31402
(P) 912 236-3311
(F) 912 236-8725
btuten@olivermaner.com

*/s/ Ben T. Tuten*
BEN T. TUTEN
Georgia Bar No. 299110

*Attorney for Energizer Holdings, Inc.*

11