Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

KENNETH BOATRIGHT,              )
                                )
       Plaintiff,               ) CIVIL ACTION FILE NO.:
                                ) 5:24-CV-58
vs.                             )
                                )
DISCOUNT AUTO PARTS, INC.,      )
and ENERGIZER HOLDINGS, INC.,   )
                                )
       Defendants.              )

- - -

The cross-examination of SCOTT C. BIONDICH,

Taken on behalf of the Plaintiff, pursuant to the

stipulations set forth herein, before Jasmine

Ingram, Certified Court Reporter, taken 1150 North

Brown Road, #125, Lawrenceville, Georgia, on

Thursday, the 12th day of March, 2026, commencing

at approximately 10:12 a.m.

---

Page 2

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

        KENNETH FUTCH
        DEBORAH FUTCH
        THE FUTCH LAW FIRM
        404 West 16th Street
        P.O. Box 687
        Alma, Georgia 31510
        (912)800-9040


ON BEHALF OF THE DEFENDANT:

        BEN T. TUTEN
        OLIVER MANER LLP
        P.O. Box 10186
        Savannah, Georgia 31402
        (912)236-3311

        SEAN MARTIN
        STEPHEN SWANSON
        CARR ALLISON
        633 Chestnut Street
        Suite 2000
        Chattanooga, Tennessee 37450
        (423)648-9834


Also Present:

        Bernardo Zito Porto

---

Page 3

INDEX

Cross-Examination:                    Pages:

By Mr. Tuten. . . . . . . . . . . . . . 5-133

By Mr. Swanson. . . . . . . . . . . . 133-149

By Mr. Tuten. . . . . . . . . . . . . 149-150

EXHIBITS
ALL EXHIBITS MARKED
                            Page Marked/
Exhibit No.    Description           Identified

| Exhibit No. | Description | Page Marked/Identified |
|---|---|---|
| D1 | Notice of Deposition | 7/7 |
| D2 | CV | 8/8 |
| D3 | List of publications | 33/33 |
| D4 | Testimony and deposition history | 34/34 |
| D5 | Expert Report | 39/39 |
| D6 | Timesheets | 128/128 |

---

Page 4

PROCEEDINGS

                    10:12 a.m.

(Whereupon, the court reporter complied with the requirements of O.C.G.A. 9-11-28(d).)

MR. TUTEN:  All right.  This will be the deposition of Scott Biondich, in the case of Kenneth Boatright v. Energizer Holdings, Incorporated, et al, Civil Action No. 524CV58, which is pending in the United States District Court for the Southern District of Georgia, Waycross Division.  This deposition is being taken pursuant of notice by agreement of counsel for all purposes allowed under the federal rules of civil procedure.

I propose that we stipulate to the qualifications of the court reporter, reserve objections except to form of the question and responsiveness of the answer until such time as a transcript is sought to be used at hearing or trial, if that's agreeable, Ken?

MR. FUTCH:  That's acceptable.

MR. TUTEN:  Do you plan to read and sign, Mr. Biondich?

MR. BIONDICH:  Pardon me?

MR. TUTEN:  Are you going to read and sign your deposition transcript?

MR. FUTCH:  That's entirely up to you, if you

Page 5

want to read and sign.

MR. BIONDICH: Would that be afterwards? I mean, once I have a chance to go through it and look for errors?

MR. TUTEN: Yeah. To review it -- yes.

MR. BIONDICH: Would you like me to?

MR. FUTCH: That's up to you. I would.

MR. BIONDICH: I mean, I can't -- pardon me?

MR. FUTCH: Go ahead --

MR. BIONDICH: I can, yes.

MR. FUTCH: Yeah.

MR. TUTEN: Okay. Then, I'd propose that we stipulate that he remains under oath, so he doesn't have to get a notary or anything like that to --

MR. FUTCH: -- right. Yes.

MR. TUTEN: All right. Can you go ahead and swear the witness?

(Witness sworn.)

Whereupon,

SCOTT C. BIONDICH,

was called as a witness herein and, having been first duly sworn, was examined and deposed as follows:

CROSS-EXAMINATION

BY MR. TUTEN:

Q. Mr. Biondich, my name is Ben Tuten. We've never

Page 6

met before today, true?

A. Correct.

Q. Yeah. I represent Energizer in this case. Do you understand that?

A. Yes.

Q. You've been identified as an expert witness to provide opinion testimony on behalf of the plaintiff in this case. Do you understand that?

A. Yes.

Q. I'm here to take your deposition today and hopefully figure out what your opinions are and the factual basis for those opinions, okay?

A. Yes.

MR. TUTEN: If at any time you don't hear one of my questions or don't understand what I'm asking, I want you to stop me and tell me, okay?

THE WITNESS: Yes.

MR. TUTEN: And if you do that, I'll be happy to repeat the question.

THE WITNESS: Okay.

MR. TUTEN: If you don't do that, if I -- if you do not tell me to stop or tell me to clarify or that you don't understand, then I'm going to assume that you understood what I asked you, okay?

THE WITNESS: Yes.

Page 7

MR. TUTEN: Is that fair?

THE WITNESS: Yes.

BY MR. TUTEN:

Q. Is there any reason that you can't hear me or understand me, or truthfully answer my questions today?

A. No.

Q. I'm going to hand you what we have marked as Exhibit 1.

And Sean, just for your information, this is the notice of Mr. Biondich's deposition.

Have you seen this document before?

A. Yes.

Q. If you look at the last page -- I guess the last two pages, it's titled "Exhibit A." Do you see that?

A. Yes.

Q. And there are several requests for -- for documents in your possession, custody, or control for you to produce to me, correct?

A. Yes.

Q. Did you bring any of these documents with you today?

A. No.

Q. Have you gathered these documents and produced them to Mr. Futch to be produced?

A. Yes.

Page 8

Q. Is it your understanding those documents have been produced?

A. Yes.

Q. I want you to look at request No. 7, which says, "Copies of all correspondence, communications, documents, reports, memoranda, other written or electronically exchanged material between you and any person relating to this matter." It goes on to have several sub-questions. I believe that we might have received communications immediately before this deposition.

But is it your understanding that you gathered communications with others about this matter and produced them to Mr. Futch?

A. Yes.

Q. Okay. I have not had the chance to review those yet. So, I might try to look at them during a break and see what the volume is, or if I can formulate some questions off the basis of those.

But if I don't have the chance to get to them, then I will reserve the right to reopen your deposition and ask you questions about that; is that okay?

A. Yes.

Q. Okay. I'm going to hand you what we have marked as Exhibit 2.

And Sean, this is Mr. Biondich's CV. This was

Page 9

produced to us just a few days ago.

Is this the most recent copy of your curriculum vitae?

A. I believe so. Yes.

Q. I'm going to start from the end, I believe it's page 3. The section says "Education and Training."

A. Uh-huh (affirmative).

Q. And you received your Bachelor of Science in Mechanical Engineering from Michigan Tech?

A. Yes.

Q. What year was that?

A. 1983.

Q. 1983?

A. Yes.

Q. Did you get your master's immediately after that?

A. Yes.

Q. So you went -- you did bachelor/master's.

Did you have any work in between then?

A. No.

Q. Did you work concurrently while you were pursuing those degrees?

A. No.

Q. So you received your master --

A. I mean, I did work at the university, but --

Q. Sure.

A. Yeah.

Page 10

Q. But not -- not --

A. Not a regular job.

Q. Okay.

A. Not a real job. How about that?

Q. I got you. So, after you received your master's degree from Michigan Tech, what year was that?

A. 1985.

Q. 1985. And that's when you started at Alcoa?

A. Correct.

Q. What is Alcoa?

A. It's an aluminum company.

Q. An aluminum company?

And what -- it looks like you had several different roles over your time at Alcoa.

A. Yes.

Q. Just describe for me what those roles were.

A. Okay. When I started, I was doing two different jobs. It was kind of split 50/50.

One was, I was being trained as the company's sheet metal expert to try and help solve customer problems. So, I was working under the wing of a gentleman who was going to retire, and they were trying to groom me to fill his position. So I'd work on anything from airplanes to cars to cake pans.

The other half of my time was spent working on

Page 11

beverage can ends. So I did that for a couple of years. I didn't like the sheet metal troubleshooting job, so I asked to move into packaging full-time, which I did. I worked again for a few more years as an end expert, developing new beer and beverage can ends. Then I actually moved into the -- the can space --

Q. Uh-huh (affirmative).

A. -- and worked on some can projects.

And then, the last four years, I was heading up innovation on the R&D side. So I had a small team working for me, and we were developing new packages out of aluminum.

Q. Okay. What is the distinction between -- you said you were working in the beer and -- or "beer can space," and then you moved into the "can space."

What is the distinction between those two?

A. Yeah. It's very particular in terms of what part of the can you're working on. So, the can is considered the "can body."

Q. Uh-huh (affirmative).

A. The cylindrical portion with the bottom on it. And the end is the piece sometimes referred to as a "lid" --

Q. Uh-huh (affirmative).

A. -- that's double-seamed onto the can. So the can

Page 12

is usually filled with whatever product goes inside, whether it's a -- a food can, a beer can, an aerosol can, and then an end is seamed onto that afterwards.

Q. So when you were working -- well, I guess let me back up.

When you were working on beer cans, which portion of the can would you have been working on?

A. I started off working on the end, which is the lid or the top, the part you open.

Q. Uh-huh (affirmative).

A. Then I moved to the can, which is the can body. And then, in the end, I was developing new products out of aluminum, new packaging products. Like aluminum bottles, sleek cans that are used today for, like, seltzer drinks, the skinny cans.

Q. Uh-huh (affirmative).

A. Yeah. Those types of things.

Q. And you make reference, I guess, to these innovations in your CV.

What is a B64 inch --

A. That is the name for a particular style of beer and beverage can end. So, before I got to Alcoa, somebody at Alcoa had invented it and got a patent on it. And when I started, one of my jobs was to commercialize it. So I ended up working on that with the can companies that

Page 13

actually make the ends, and that ended up becoming a global standard. It was used all over the world for a number of years, and now it's been replaced.

Q. And tell me about the DNI aluminum bottle.

A. So, the process by which beverage cans are made is called "DNI." That means "drawn and ironed."

Q. Uh-huh (affirmative).

A. So, you'd draw a cup, you redraw the cup, and then ironing is stretching out the walls to make it taller. And then, what we did is we necked that down.

If you look at a beer or beverage can today, the end is a smaller diameter than the body of the can. And that taper at the top is called "necking." And what we did is we necked the top of a can like 15 or 20 times and brought it all the way down, so the opening was only about 38 millimeters. And then we either threaded that or put a plastic outsert on it that was threaded, and then we put what's called an "ROPP" closure on that, roll-on pilfer-proof.

So, if you look today in the market, Coors and Miller have aluminum bottles with a 38-millimeter closure on them. I developed those.

Q. Okay.

A. With -- with my team.

Q. And that leads me to my next question is, at

Page 14

Alcoa, were you in a management position?

A. Yes.

Q. And you were managing a team that was working on these different can innovations?

A. Yes.

Q. And just from talking to you, my understanding is that Alcoa is an aluminum company, and they developed these different vessels, different containers, different cans, and they would then sell them or sell the technology to other parties, who then would use them to -- to fill with their products?

A. Their goal was to sell more aluminum, so they would protect them and get patents. But typically they gave the technology away for free, and --

Q. So, would they manufacture the cans themselves, Alcoa?

A. No.

Q. Okay.

A. They just made the aluminum for the cans or the ends.

Q. Okay. Why did you leave Alcoa?

A. I got a call from Coca-Cola about coming down to Atlanta to work.

Q. And that was in 1997?

A. Yes.

Page 15

Q. And when you went to Coke in 1997, what was your role then?

A. My first job there, I was a metal forming expert. So I was working on all metal packaging, and it was a global assignment.

Q. So, elaborate on that a little bit. What would your day-to-day look like?

A. Working on anything related to Coke's metal packaging. Could be the metal itself, could be the can design, the end design, the coatings, the lubricants, filling of cans.

Q. And how long did you hold that role?

A. One (1) year.

Q. And then you became a manager with the global packaging materials?

A. I -- yes.

Q. Okay.

A. I became a group manager.

Q. And what would you do in that role?

A. Then, I had responsibility for materials development that were used in -- these are materials that are used to make packaging. So I was over metal, plastics, and glass and ceramics.

Q. So, not so much the development of the packaging themselves, but the constituent parts of them?

Page 16

A. The materials that -- yes. The packages were made from.

Q. Okay. And how long did you have that role for?

A. Two (2) years.

Q. And then, what did you do after that?

A. It gets a little fuzzy, exactly how long I did each role and what I did. But I think at that point in time, I was still doing metal packaging. And I also started managing design, which was both industrial design and computer-aided design.

Q. And when you were managing over design, you were, at that point, involved in designing, launching, and commercializing products for Coke?

A. Yes.

Q. And the products would be different types of -- cans or bottles?

A. Any type of package. Yes.

Q. Any type of package. Okay.

A. Yes. From scratch, I mean --

Q. Uh-huh (affirmative).

A. -- from the initial designs.

Q. Okay. Would that include overseeing the manufacturing of those products?

A. You mean overseeing the manufacturing of the -- the packages themselves?

Page 17

Q. Of the packages themselves.

A. No. We had -- we had suppliers that did that.

Q. Okay. So, Coke, at least the division of Coke you were within, did not oversee the manufacturing of the actual packages? They outsourced that to someone else?

A. Not exactly.

Q. Okay.

A. So, I was in Corporate.

Q. Uh-huh (affirmative).

A. We set all the global specifications, developed packages, and things like that. The company had can suppliers or bottle suppliers, whether they're plastic or glass, that supplied us. And then those companies tended to work with our divisions.

Q. Uh-huh (affirmative).

A. So Corporate really didn't buy anything.

Q. Right.

A. We negotiated.

Q. Sure.

A. But the divisions actually did the purchasing, and the divisions would go to visit the suppliers.

Q. Okay. I guess what I want to know is, in your roles with Coca-Cola, would you have -- would your day-to-day consist of going to the suppliers who were actually manufacturing these specifications that you provided in

Page 18

providing any oversight to that process?

A. "Yes" to part, and "no" to part. So, we had oversight of them.

Q. Uh-huh (affirmative).

A. One of the nice things of working at Coca-Cola is you could call up your suppliers and say, "Please come to me." So -- and they did. So, most of my meetings, our suppliers came to Atlanta to meet with us.

Q. Uh-huh (affirmative).

A. But I also occasionally went to our suppliers as well. But most of the meetings that we had were in Atlanta.

Q. Okay. So talk me through the remainder of your time at The Coca-Cola Company. What other roles did you do there?

A. Then, I believe I was in a role where I worked on PET packaging for a couple of years. And I had, specifically, one big project that I remember, and that was to provide a barrier on the PET bottle, so it did not lose carbonation --

Q. Uh-huh (affirmative).

A. Or let oxygen in. But it was more about keeping the carbonation in the bottle. It was a chemical vapor deposition process. So, you actually created, like, a little explosion within the bottle, and it would plate out

Page 19

a coating on the inside of the bottle, which was a very, very thin layer of glass that was actually flexible.

Q. Uh-huh (affirmative).

A. And then that would be an impervious barrier and not allow the -- the carbon dioxide to get out of the bottle. So I spent about two years working on that process. And then, I moved into a role where I worked with our global marketing team on developing new innovations for our sparkling brands, so meaning the product had bubbles in it.

Q. Uh-huh (affirmative).

A. Coke divides their products into two different types, those with bubbles and those without. So, Coke, Sprite, Fanta have bubbles. Dasani, Minute Maid do not.

Q. Uh-huh (affirmative).

A. So just like there's can bodies and can ends, there's bubbles and no bubbles in the Coke world.

Q. Okay.

A. So, I worked with that team for five years.

Q. Uh-huh (affirmative).

A. And then, I moved to our North America division, so I left Corporate, and went to work for the North America division, which was actually on the same campus. And I worked there for five years.

For the first three years, I was heading up sparkling

Page 20

packaging development for North America. And then, the last two years, in addition to doing that, I also was developing sales equipment. I led a team on both of these sides. I was leading a team that did sales development for equipment. So we were developing the next generation of coolers, beverage dispensers, and vending machines.

Q. Okay.

A. And then in 2015, they offered me a retirement package. I took a look at it, it looked like a really good deal, and I took it.

Q. So, when you're working with Coke North America, you described it, it seemed to me, as more of a sales-facing role?

A. No. All my jobs were technical.

Q. Okay.

A. Every single job was technical.

Q. Okay.

A. Research and development.

Q. Okay. So even between 2010 and 2015, you were still working on developing products, commercializing them, coming up with specifications for them, coming up with the designs, launching them?

A. Yes.

Q. Okay.

A. I pretty much worked on metal packaging my entire

Page 21

career. But then, as I took on some of these other roles, I had responsibility, either for other materials, like the plastic and the glass that we talked about earlier. Or, like, in the end, I was also responsible for not only plastic and glass, but also, like, paper board, corrugated shrink film. So a number of other materials in addition to metal.

Q. Okay. Throughout your career in the packaging industry, I guess the -- let's say at your time between Alcoa and Coca-Cola, did you work on any automotive products?

A. No.

Q. And you retired from Coke in 2015.

Is that when you started Packaging Innovation & Design?

A. Yes.

Q. And that's a consulting business?

A. Correct.

Q. You have on your CV, Packaging Innovation & Design, and the CANsultants.

What are -- what is the difference between those two entities?

A. So, Packaging Innovation & Design is my company.

Q. Uh-huh (affirmative).

A. And I had a colleague that I worked with at Coke.

Page 22

We actually carpooled together. He was offered a retirement package at the same time I was. We both started our independent consulting practices.

Q. Uh-huh (affirmative).

A. And about six months into it, we got a call from the same company to consult for them.

Q. Uh-huh (affirmative).

A. And I figured out that we were going to be competing against each other. So, I called him up -- and he had asked me to be his reference.

Q. Uh-huh (affirmative).

A. And I called him back, and I said, "No, I won't be your reference." And he said, "Why is that?" I said, "Because I'm your competitor." But I said, "I have a proposal for you, why don't we work together?" So, I told him I'd give him 24 hours to think about it. He said yes immediately. We worked together on putting together a joint proposal, we got the job, and we thought, hey, maybe there's something to this working together. And we started marketing ourselves that way, and we -- we got a lot more business than we did independently. So, we created the CANsultants, that was 2016, and then we worked together for just under ten years. He retired in, like, 2024 -- I think March of 2024.

Q. Uh-huh (affirmative).

Page 23

A. Thereabouts. And then, now I'm working as Packaging Innovation & Design again.

Q. What was that individual's name?

A. John Adams.

Q. John Adams?

A. Yep.

Q. So, between 2016 and 2024 when you were the CANsultants, Packaging Innovation & Design was essentially sidelined. Is that fair to say?

A. Not really. I wasn't working under that company name. But the cash flow went from CANsultants, and then 50 percent went to him and 50 percent went to me, and they went to our respective consulting businesses.

Q. I got you.

A. So --

Q. And today, you're back to being Packaging Innovation & Design?

A. Yes. Because he retired a little over two years ago now.

Q. Do you have any partners in that business?

A. Packaging Innovation?

Q. Yes.

A. No.

Q. Do you have any employees?

A. No. Not at this time.

Page 24

Q. Have you had any employees?

A. I've had my wife help me from time to time with administrative stuff.

Q. Has she done any work on this case?

A. No.

Q. How much of your consulting business is comprised of serving as an expert witness in litigation cases?

A. It'll be an estimate.

Q. That's fine.

A. I'm guessing over, like, the 11 years I've been doing it, maybe 15 percent, 20 percent, in that ballpark.

Q. Do you have any previous cases you've served as an expert witness in, either as a retained or testifying?

A. Yes.

Q. How many?

A. I think five before this, where I've been deposed. And then, there were other cases I worked on where I never got deposed. So there -- I probably have been on a total of about ten --

Q. Okay.

A. -- cases.

Q. Over the --

A. Ten (10) -- over the 10 -- 11 years. Yes.

Q. Okay. Do you have a breakdown of how many of those cases you served as an expert witness for the

Page 25

plaintiff versus serving as an expert witness for the defendant?

A. Not exactly. Most of them have been for the plaintiff.

Q. Have you ever had any engagements with my firm before, Oliver Maner, in Savannah?

A. No.

Q. Have you ever had any other engagements with Mr. Futch's firm?

A. No.

Q. Have any other engagements with Mr. Martin's firm, which is Carr Allison?

A. No.

Q. Have you ever consulted for Energizer Holdings, Incorporated?

A. No.

Q. Any other subsidiary of Energizer?

A. No.

Q. Have you ever consulted for Discount Auto Parts?

A. No.

Q. So, besides the 15, 20 percent of your business that is serving as an expert witness, what is the remainder of your consulting business comprised of?

A. Developing new innovative packages. So I typically help other companies develop packages, bring them

Page 26

to market, reviewing specifications for companies, their packaging specifications, and then just general problem solving or troubleshooting.

Q. Do you have some representative clients that you've -- have worked with?

A. Yes.

Q. And who would that be?

A. Molson Coors, Coca-Cola, Pepsi Cola, Exal, a lot of the smaller ones, I don't really know the names. And -- and the majority, in terms of numbers, of our -- our clients -- or my clients have been smaller companies.

Q. Is it fair to say that most of the companies you work with are in the beverage space?

A. Yes. But I have worked with companies in the aerosol space.

Q. Like who?

A. Exal was one, and then the other companies, I can't remember their names.

Q. In the course of your consulting business, have you ever worked on an automative -- on -- on an automative -- strike that -- on an automotive product?

A. Yes.

Q. Which product have you worked on?

A. I don't remember exactly. It was some type of a lubricant, an aerosol lubricant.

Page 27

Q. Do you know what component of the vehicle it was meant to work with or go with?

A. No. I don't remember.

Q. Was it an air conditioning recharger?

A. No. No, it was not. I know it wasn't that.

Q. And to be clear, you've never worked on the EZ Chill product before?

A. Other than using it.

Q. Other than using it?

A. Yeah.

Q. Have you used EZ Chill before?

A. Yes.

Q. How many times have you used it?

A. Probably two.

Q. Have you had any issues with it?

A. No.

Q. You've been in the packaging industry for a long time, fair?

A. Yes.

Q. You worked on a lot of products during that time?

A. Yes.

Q. You've been involved in the creation of those products?

A. Either creating or helping others to create or further their design --

Page 28

Q. And has --

A. -- development. Yes.

Q. And you've worked on the design of them?

A. I'm not a designer per se, but I work with designers and I also input on designs from an engineering standpoint.

Q. That's an intensive process, right?

A. Yes.

Q. A lot goes into it?

A. Yes.

Q. And you're proud of the products that you've helped create, true?

A. Yes.

Q. So you'd agree with me that if someone is questioning the integrity of a product, it's important they have all the facts, right?

A. Could you restate your question?

Q. If someone is questioning the integrity of a product, it's important that they have all the facts, right?

A. Yes.

Q. And if someone's offering opinion about a defect in a product, it's important that they have all the facts, right?

A. Yes.

Page 29

Q. Because otherwise they might miss something?

A. Correct.

Q. And if someone's offering an opinion and they know there are facts missing, then it's important to investigate that, right?

A. Well, I want to back up. I don't know if you ever know if you have all the facts or not. Because you -- nobody really knows how many facts there are. So, I mean, you want to have as many as possible, but I don't think anybody knows if they have them all, at any time.

Q. If you do know there are facts missing, if you think there's information missing, it's important to investigate why that is, right?

A. Yes.

Q. So that you can form a complete opinion?

A. Yes.

Q. I want to go back to the last page of your CV. You have here, under Education and Training, a series of certifications listed.

Can you tell me what the Strategy and Innovation Executive Education Certification is?

A. Yeah. That was like a two-day course offered by MIT for working professionals, to teach them about new product strategy and innovation strategy.

Q. Did you have to take a test or anything to get

Page 30

that certification?

A. Not that I recall.

Q. You just attended a two-day seminar and --

A. Yes.

Q. You got it?

A. Yes.

Q. When did you get that certification?

A. I don't remember. It was during my time at Coca-Cola.

Q. So, more than ten years ago?

A. Yes.

Q. Okay. How about the past New Product Development Certification?

A. That was another certification that had to do with new product development. And there's training offered for that, and there is an exam. It's like a national organization.

Q. Did I see somewhere on your CV that you are associated with this Product Development and Management Association?

A. Yes.

Q. What is your affiliation with that group?

A. I was on their board of -- the -- the organization had a -- an Atlanta chapter, and I was on their board of directors for a period of time.

Page 31

Q. Did you complete the examination to obtain this certification?

A. Yes.

Q. Do you know when that was?

A. No. But, again, during my years at Coca-Cola.

Q. Have you ever had to renew it or retest to obtain renewal certification?

A. It's expired, at this point.

Q. Okay. Is that why it says, "past," on your CV?

A. Correct.

Q. Okay. So, the same thing for the Project Management Certification, that's an expired certification?

A. Correct.

Q. And tell me about what that entailed, obtaining it.

A. Again, there were -- there were a number of training courses. It's a national organization, and it talks about all different management -- or excuse me, all different principles related to project management. And then, there's an exam for that as well.

Q. Did you have any affiliation with the Project Management Institute besides this certification?

A. No.

Q. How about these professional affiliations? What's the Institute of Packaging Professionals?

Page 32

A. That's a national organization of people who are working in the packaging field. So, you can join the organization. They provide ongoing training, and there are, again, different chapters around the country.

Q. Are you the president or on -- serve the board of that organization or any of its chapters?

A. I'm on the board currently of the Southeast Chapter. And I was the president for two different time periods.

Q. And the next thing is the Packaging Digest Magazine editorial board. What is that publication?

A. That is a national trade journal. They publish, like, monthly as well as doing, like, newsletters and things like that. And I was asked to be on their editorial board for a period of time. I'm no longer on that board.

BY MR. TUTEN:

Q. How about The Canmaker magazine?

A. So, The Canmaker is a global magazine trade journal, and it all has to do with metal packaging. And, again, I was invited to be on their editorial board quite a number of years ago. And I'm still on the board -- on the editorial board.

Q. On the very bottom, you say that you have approximately 20 patents.

A. Yes.

Page 33

Q. You know how many patents you actually have?

A. About 20. That's all -- I've tried to find them all. I'm -- it's pretty close to 20, plus or minus one or so.

Q. Do any of those patents bear on your opinions in this case?

A. No.

Q. Are any of those patents in the automotive space?

A. No.

Q. I'm going to hand you what we've marked as Exhibit 3.

Sean, this is a list of his publications that was produced to us.

Do any of these publications bear on your opinions in this case?

A. No.

Q. How about any of the publications that you reference in other papers/presentations?

A. Those are from back, like, when I was in college and just starting my career. They were very technical papers related to stretching metal, so they don't really apply.

Q. Have you relied on any literature or publications in forming your opinions in this case?

A. No.

Page 34

Q. I'm going to hand you what we have marked as Exhibit 4. This is your testimony history, your deposition history. I'm just going to walk through these and ask you about each.

Ball Metal Beverage Container Corporation v. Crown Packaging Technology et al. What was your engagement in that case?

A. I was working for Crown, and it was a patent infringement case on a end design.

Q. And your deposition was taken in that case?

A. Yes.

Q. Did you testify at trial in that case?

A. No.

Q. Were your opinions excluded in that case?

A. No.

Q. Is that case still ongoing or is it resolved?

A. It's resolved.

Q. Number 2 is Yang v. Plasti Dip International et al, in Superior Court of California. What was your engagement in that case?

A. I was supporting the plaintiff. And the plaintiff had an aerosol can of Plasti Dip, which is a -- a rubberized spray, blow up on him. And the contents ignited, and he was badly burned.

Q. And which party, in this case, engaged you as an

Page 35

expert witness?

A. The plaintiff.

Q. And what opinion did you render in that case? Opinions?

A. That the correct test procedures were not being conducted on the containers.

Q. Were your opinions excluded in that case?

A. No.

Q. Is that case ongoing or is it resolved?

A. It is resolved.

Q. Was your deposition taken in that case?

A. Yes.

Q. Did you testify at trial in that case?

A. No.

Q. Number 3 is Ball Metal Beverage Container Corporation v. Crown Packaging, v. Rexam Beverage Can Company in Southern District of Ohio. What was your engagement in that case?

A. So that was a continuation of the first case.

Q. Uh-huh (affirmative).

A. Initially, when I was deposed, I was working at a very specific area that was related to the B64, in that we talked about earlier. I'm a -- an end-forming expert, in addition to being a metal packaging expert, and they were using my expertise around the formation of ends. But then

Page 36

what happened is, the case went on for so long that one of the expert witnesses had to pull out of the case.

Q. Uh-huh (affirmative).

A. And they asked me to take on a -- a larger role within the case for them. And in that particular instance, now I was being deposed relative to some of the more detailed analyses around angles in these different end designs.

Q. In this case, did you offer an opinion about whether a product was defective?

A. No. I was looking at infringement, whether or not -- yeah. A design's infringed or not.

Q. Were you deposed in this second Ball Metal case?

A. Yes. I said it was a continuation. It was --

Q. Right.

A. -- the same case, but now I took on a different role, so now it --

Q. I see.

A. I was being deposed on a different topic.

Q. I see. Number 4 is Lewis v. Conagra Brands Incorporated. What was your engagement in that case?

A. I was working for the plaintiff. And they were using an aerosol can of Pam cooking spray, and it exploded on them in their kitchen. And, again, the explosion ended up igniting, and they were also badly burned.

Page 37

Q.   Your deposition was taken in this case -- in that case?

A.   Yes.

Q.   What opinions did you render as to the aerosol can, in that case?

A.   That the can, again, wasn't tested properly and did not meet performance criteria.

Q.   Were your opinions excluded in that case?

A.   No.

Q.   Did you testify at trial in that case?

A.   No.

Q.   Is that case still ongoing or is it resolved?

A.   It's resolved.

Q.   Number 5 is Ardagh Metal Packaging v. American Craft Brewery, in Federal Court in Illinois.  What was your engagement in that case?

A.   So, I was hired by American Craft Brewery, which you may know better as Boston Beer.

Q.   Uh-huh (affirmative).

A.   And Ardagh filed suit against Boston Beer because they claimed they did not buy as many cans as Boston Beer was supposed to from Ardagh, per their contract.  And Boston Beer was having problems running the Ardagh cans, and that case is still ongoing.

Q.   And did you offer an opinion, in that case, as to

Page 38

a defect in any product?

A.   Yes.

Q.   What was that opinion?

A.   That the over-varnish and wax on the outside of the can were leading to buildup on the rails in the filling line.  And that that was causing mobility problems with the cans, and that the -- that Boston Beer was not able to get the throughput that they normally got.

Q.   Were any of your opinions in that case excluded?

A.   One was.

Q.   And what opinion was that?

A.   That the can contained a major defect based upon the definition and the contract that the two companies had together.  The judge just ruled on this, like, this week.

Q.   Uh-huh (affirmative).

A.   He said that interpretation of the contract is a legal matter, and that's up for the jury to decide.  And that was not something for me to, like, give the jury my opinion on.

But other aspects of my testimony were -- were allowed.

Q.   These five cases are all the depositions that you've given in your consulting career?

A.   Correct.

Q.   Besides these five cases that we've discussed,

Page 39

have you ever had your opinion struck in any other matter?

A.   No.

MR. TUTEN:  You want to take a five-minute break before we dive into this expert report?  You want to --

MR. FUTCH:  Sure.

THE WITNESS:  Sure.

MR. TUTEN:  Okay.

Off the record.

(Whereupon, a discussion ensued off the record.)

BY MR. TUTEN:  (Resuming)

Q.   All right.  We are back on the record.

I am going to hand you what we've got marked as Exhibit 5.  And this is the expert report that was produced to us.  I think it's in a more usable form somewhere, but this is how it was produced to us.  So, this is --

A.   Oh --

Q.   The one I'm going to look at.

A.   Yeah.  I see what you're talking about.

Q.   Yeah.  And if we get to something that we need to look at one of the images or something like that, I've got a cleaner copy.

A.   Okay.

Q.   In this binder down here, I can show you.

A.   Okay.

Page 40

Q.   This is the expert report you prepared for this matter, true?

A.   I'll just flip through it quick.

Q.   Sure.

A.   Yes.  It appears to be.

Q.   How many drafts of this report did you prepare?

A.   About six or seven, maybe.

Q.   And what was the time horizon of your preparation of those various drafts?  When did you start?  When did you finish?

A.   I don't even know.  Let's see.  It was probably over a period of several months.  I think I've sent you all the drafts.  I don't know if you've got them yet or not, but --

Q.   Yeah.  I --

A.   Okay.

Q.   And this report contains all of the opinions that you have rendered in this matter, true?

A.   Yes.

Q.   All right.  I'm going to start going through it. Section 1 and section 2, I think we've covered already with your CV.

A.   Okay.

Q.   And your qualifications.

Is there any other part of your background, any

Page 41

literature, or any other training or qualification we've not discussed, which you employ or use to render your opinions?

A. Just my experience over 40 years working with the double-seaming process, double seams, double-seam failures, double-seam defects, can failures, metal package forming, those types of things.

Q. Section 3 is Materials Considered, which references Attachment C, which is at the back here. If you look at the numbers at the top, Attachment C starts on page 30.

A. Okay.

Q. Is this a list of everything that you considered in formulating this report?

A. Yes. In terms of documents.

Q. And this is a list of all the documents that you considered in formulating your opinions in this case?

A. Yes.

Q. So, if there's a document not on this list, it's fair to say you didn't consider it in creating this report?

A. Yes. That's correct. I've gotten two more documents since I wrote this report.

Q. Sure.

A. So those --

Q. -- those to you, yes.

Page 42

A. Yeah. Those would not be included in here.

Q. Okay. Section 4 discusses Compensation, and you state that you're being compensated a rate of $400.00 per hour for consultation, a rate of $600.00 per hour for time spent preparing to deposition -- for deposition trial testimony.

Are those -- is that still your rate of compensation?

A. Yes.

Q. Do you know, ballpark, how much you've billed to this file, to this case so far?

A. No. I don't keep track of that. But again, I think I've turned over my invoices to you.

Q. Uh-huh (affirmative).

Section 5 is this Introduction to Aerosol Cans, where you discuss the different configurations of can bodies, true?

A. Yes.

Q. Where did you source the images that appear on this page?

A. Just on Google searches.

Q. You say, "Aluminum aerosol cans are typically made by impact extrusion. The can bottom, can sidewall, can top are all integral, made from the same piece of aluminum."

Was the -- is the subject product an aluminum can?

Page 43

A. No.

Q. What material was it made out of?

A. Steel.

Q. And I have a feeling we're going to talk about this later when we talk about double-seaming and that process.

Is a steel can made from -- is a -- is a steel can integral? Is it made from the same piece of steel, or is it different components that are --

A. Yes.

Q. -- together?

A. Yeah. There's two different types, and they're both made from different components.

Q. Okay. And the product, in this case, is a two-piece steel can, true?

A. I believe it's a three-piece.

Q. A three-piece?

Go to the next page -- the top says page 16. First sentence, "The can that failed in Mr. Boatright's hand was a two -- can, as categorized by the Department of Transportation, and is a two-piece can similar in construction to that shown in image 2."

A. Okay. Then I'm in -- I stand corrected.

Q. Okay. So you agree with me it's a two-piece can?

A. I'd like to look at it again. I could -- or a

Page 44

picture of it, I could confirm that.

Q. Let me see. I imagine there's a picture in your report. Well, I don't know that it'll show the entire thing.

A. Or there might be one in Dr. Dee's (ph) report. I don't know if you have that with you. The problem is the overcap covers some of that area.

Q. This is an exemplar, but it's the same can. Just for the record, I'm handing the witness a copy of Dr. Sean Dee's (ph) expert report. We're not going to enter that as an exhibit at this time.

A. I think I'll -- I'd like to look at additional pictures.

Q. How can you tell from looking at a can whether it's a one-piece, two-piece, or three-piece?

A. The number of double-seams.

Q. I don't know that there's another good picture in these reports that show the full can.

A. If we had a big --

Q. There's one --

A. -- make -- or if we had a big -- yeah. A picture of the failed can. Yeah.

Yeah. Unfortunately, I can't see the top of the can well because of the -- the overcap that's on there.

Q. Uh-huh (affirmative).

Page 45

A. That's what I need to see.

Q. Is there a material difference in how a two-piece can and a three-piece can are manufactured?

A. Yes. The two-piece, the can body and the top where it's necked and the curl is formed, that the valve is crimped onto, that's all one piece. In the other case, there's a cylindrical body with a top, I'll call it conical-sectioned, double-seamed to the top of that.

Q. Is it fair to say that whether -- if the can is a two-piece or three-piece have a material impact on your opinions in this case?

A. No. Not the opinions that I -- or the conclusions I came to.

Q. So, sitting here today, you do not know if it's a two-piece or a three-piece can?

A. I'm not 100 percent certain.

Q. And do you -- do you feel comfortable deferring to what is in your report, where you said that it is a two-piece can? Or do you think that's incorrect?

A. I'm not sure.

Q. Because you examined this can.

A. I did.

Q. True?

A. Yes.

Q. And when you examined the can, you would've

Page 46

formed an opinion on whether it's a two-piece or a three-piece can?

A. Yes.

Q. But sitting here today, you don't remember?

A. Correct.

Q. I want you to look at Section 6, Special Permits. You start out by saying, "The failed can, in this case, is a DOT Specification 2Q can, which has two special permits, namely DOT-SP 10232 and DOT-SP 14188."

Do you stand by that opinion?

A. Based on the documents I've read, there's differing opinions.

So, I read a response from the attorneys on your side answering a question from Mr. Futch, and it said that both of these applied. And then, when I read Dr. Dee's report, he said only one of these applied.

Q. Have you looked at -- well, these were produced to you, true? The special permits in question?

A. Yes.

Q. If you look at the special permits, do you -- who was the grantee for each? Do you know?

A. I'm not 100 percent certain.

Q. If I were to tell you that Energizer's not the grantee for both permits, would that surprise you?

A. I didn't think they were on one of them. I

Page 47

couldn't remember on the -- the second one.

Q. Do you have any evidence besides what you say you saw in a -- in a response to a discovery request? Do you have any other evidence that DOT-SP 14188 applies to the subject product?

A. No.

Q. If I were to tell you it does not, in fact, apply to the subject product, would you have any reason to question that?

A. Could you restate the question?

Q. If I were to tell you that DOT-SP 14188 does not apply to the subject product, would you have reason to dispute that?

A. No.

Q. What we can agree and what we can see on the product itself is that DOT-SP 10232 is applicable to the subject product. Fair?

A. Yes.

Q. And that's because that mark is printed on the can, isn't it?

A. Yes. It was.

Q. Have you reviewed SP 10232 recently?

A. I've skimmed through it.

Q. If I were to tell you that the grantee on that special permit is Illinois Tool Works Incorporated, would

Page 48

that surprise you?

A. No.

Q. You talk a lot, below 10232, your discussion of that special permit, about the safety control measures that are required by that special permit. For instance, "Side seams are not permitted. The end shall be designed to withstand pressure and bottom end is fit with a pressure relief device," and talks about the burst test range, right?

A. Yes.

Q. Explain to me what this burst test or burst pressure or burst test requirement is?

A. Okay. Could I go back first to your question about two-piece or three-piece?

Q. Sure.

A. Now that we're reviewing 10232, it says, "Side seams are not permitted," which would mean it's not a three-piece can and it is a two-piece can, like I stated in my report.

Q. Okay.

A. That's enough to allow me to conclude that.

Q. Okay. I'll re-ask my question.

A. Okay.

Q. Explain what the -- what qualification burst tests are and what that --

Page 49

A. Yes.

Q. -- means within this DOT special permit.

A. Okay. I'd like to take a -- a minute just to read that again.

Q. Sure.

A. Okay. You'd like me to state the requirement in my own words?

Q. Yes, please.

A. Okay. So they're -- what they're saying is that for 5,000 or fewer containers that are manufactured in succession, they have to be burst tested.

Q. Uh-huh (affirmative).

A. So you randomly grab one from that group and test it with the pressure relief device formed into the can. And you take another can that does not have the pressure relief device squirt into it and test that. And the one with the PRD may not fail below 380, the one without the PRD may not fail below 480. If one of those fails, the lot should be rejected, unless you want to try to requalify the lot. And then, you have to go back and grab five additional random cans and test those. If all five pass, the lot is -- can be considered good. If one of those fails, the lot is supposed to be rejected.

Q. If you want to identify whether there was a manufacturing defect in one of these cans, you'd agree it

Page 50

would be important to look at that burst test data?

A. Looking at the burst test data would be helpful, but it's not required.

Q. It's important, though?

A. Yes. I'd say it would be nice to have. Yes.

Q. Have you ever worked on a product that was subject to the -- to a burst testing requirement like this?

A. Yes.

Q. What product was that?

A. All of the sparkling beverage cans I worked on, they're all metal pressure vessels. And I've also worked on aerosol cases, which are similar to this. Trying to think if I worked on -- well, in food cans, typically after they're filled, they go through a cooking process called a "retort," and they generate pressure as well. But then after they cool down, they have a vacuum inside them. So, almost all the metal packages that I've worked on have pressure in them at some point in time.

Q. Have you worked on any other products that contain a pressure relief device?

A. Yes.

Q. And what products are those?

A. I don't recall. I mean, I've worked on -- I don't know exactly what they were, what the pressure relief device looked like. But, yes. They've been on other

Page 51

packages I worked on, both metal and non-metal.

Q. You make note in your report that "There's a special provision required under Permit 10232 that each packaging manufactured under the authority of this special permit must be marked with a registration symbol designated by the Office of Hazardous Material and Safety for a specific manufacturing facility." And you say, "It did not have the marking required by Special Provision 8D."

I'm going to show you a picture of the can that is in your report. And this is just a little bit better resolution. I'm talking about, specifically, image 5, where you've boxed in the --

A. Yes.

Q. -- DOT-SP 10232 marking.

A. Yes.

Q. There's a mark immediately next to that, isn't there?

A. Yes.

Q. And what does that mark say?

A. M1119.

Q. Would you agree with me that mark designates a manufacturing facility?

A. I didn't know that. I don't know that.

Q. Do you have even any reason to doubt that it designates a manufacturing facility?

Page 52

A. I don't know what it is. I asked for the different codes on the can and did not get those.

Q. You say that you asked for different materials, different things.

What exactly are you saying when you say you asked for those materials, for that information?

A. I requested them through Mr. Futch.

Q. And it's your belief that he sent a discovery request seeking that information?

A. Yes.

Q. Okay. So you don't know what M1119 means?

A. I do from Dr. Dee's report, if he's correct. But I had not seen it until that point in time.

Q. Do you have any reason to doubt that Dr. Dee is correct, that decodes to reflect a manufacturing facility?

A. I don't know what that code means.

Q. But you state very emphatically in your report that this can, this product did not have the marking required. But you just told me --

A. Correct.

Q. -- you don't know what that code means?

A. Correct.

Q. So how can you square those two things?

A. If -- if I was shown data, like a list of their plants and a list of their codes, and that applied, then I

Page 53

would change my opinion on that.

Q. Okay. Okay.

DOT-SP 14188 is what we just talked about before this previous discussion.

You have no evidence, no independent evidence that this special permit applies to this product, true?

A. Nothing other than the documentation from one of the legal firms representing Energizer and Discount Auto Parts that listed that it had been manufactured according to that.

Q. Uh-huh (affirmative).

A. So, if that was not true, then that statement was erroneous.

Q. Okay. I think I might be able to square this a little bit here. In your experience -- well, strike that.

Have you manufactured or worked with products before that are subject to DOT Special Permits?

A. Yes.

Q. And what products would those be?

A. Plasti Dip and Pam and other products where I didn't know what the product in the can was going to be.

Q. Would you agree with me that there are instances where one line of products is subject to one DOT Special Permit, another line of products that is similar would be subject to a different special permit?

Page 54

A. Possibly, yes.

Q. Okay. Section 7, you talk about double-seaming. Describe for me, generally, what double-seaming is.

A. Double-seaming is a method of joining the -- in this instance, the can body to the can end. On this particular can, the end is actually the bottom of the can. It's kind of like the can's been made upside down. And what you do is, you have a flange on the can body, you have a curl on the end or lid, or bottom in this case and those two pieces of metal are put together. And, through a series of two rolls coming into contact with the metal, a joint is formed where there's five overlapping layers of metal. And there's also a gasket material that's placed inside of there, and that's to hold the two components together.

Q. Is that an industry standard practice? Is that how most cans are manufactured?

A. Yes.

Q. And you can tell if something is double seamed just by looking at it?

A. Yes.

Q. How can you tell by looking at it that something is double seamed?

A. Because you'll see a little part sticking out from the side of the can that's about 100 or 125

Page 55

thousandths high --

Q. Uh-huh (affirmative).

A. And it sticks out a little tiny bit from the -- the can wall.

Q. And I'm on page 18. These images --

A. Okay.

Q. -- where you're trying to describe double-seaming, or showing the process.

A. Yes.

Q. Did you source those from Google as well?

A. Yes.

Q. Okay. At the bottom of page 18, you say, "In addition to these -- to those critical double seam dimensions shown in image 8, other checks are made that include seam tightness/wrinkle rating and gap measurements above the cover hook and below the body hook."

Can you tell me what "seam tightness" or "wrinkle ratings" are, or what they mean?

A. Yes. So that one is better shown on the top of page 19.

Q. Uh-huh (affirmative).

A. And what that is showing is a progressive wrinkle. These are just examples, but as you move from left to right, the wrinkle gets worse and worse and worse.

Q. Uh-huh (affirmative).

Page 56

A. And that's actually a wave in the metal. And if it gets too bad, then that double seam will frequently leak.

Q. Uh-huh (affirmative).

A. So they like to keep the tightness similar to the left side of that picture, where either you have no wrinkle at all, or you have a very small one that only goes 10 percent down the length. So that's how it's measured, is by percent.

Q. And that's a -- is that a quality control method in the manufacturing process? You can check wrinkle --

A. Yes.

Q. -- rating?

A. Yes.

Q. Okay. And then you start discussing the subject product here. You say, "In this case, the EZ Chill can must not burst below a pressure of 380 PSIG. That means the double seam that was formed and holds the bottom of the can to the can body also has to resist 380 PSIG and stay together."

Is that what your report says?

A. Yes.

Q. And that number you've derived from the DOT Special Permit?

A. Yes. And actually, that number should be 480

Page 57

PSIG.

Q. Okay. You said, "The double seam dimension shown in image 8 are extremely critical and must be checked regularly to ensure the can performs properly. If the double seam is not formed to the correct dimensions, it can unravel and fail. It is a common industry practice -- " there might be a typo error -- a typographical error, where it says, "the measure all the seam dimensions shown above --

A. That's a big one.

Q. -- on a regular frequency."

A. Yeah. That is maybe supposed to be "to."

Q. Yeah. So, explain to me the process of how the measure of the seam dimensions would be checked?

A. Okay.

Q. As you say is an industry practice.

A. So first of all, there's a frequency at which double seams are checked. So it could be, like, once an hour, once every four hours, or so many times a shift. And then, typically, these double-seaming machines have multiple heads on them, and each one is set up independently.

Q. Uh-huh (affirmative).

A. And so, you have to check each head.

Q. Uh-huh (affirmative).

Page 58

A. So you'll go grab a can off each one of those heads, and you need to identify which head it came off of. And then, you'll take those cans and bring them to what's called a "seam saw."

Q. Uh-huh (affirmative).

A. And you actually make two parallel cuts, that are about a half an inch apart or so, through that double seam. And then take that piece out of the can, and you put it in a special double seam, like, microscope.

Q. Uh-huh (affirmative).

A. A lot of times they might polish that cross-section a little bit before they put it in the microscope, just to remove any burrs or to get a better image. And then, you look at that double seam cross-section in the scope. Some of them have automated systems that automatically go in and grab the dimensions, and some of them you have to do it manually.

And then, you'll do that, typically, at three locations around the can that relate to the material direction, so our grain direction. So, you'll try and do one cross-grain, one in-grain, and then one in between those.

Q. And in doing those checks, you're just trying to make sure that the double seam is satisfactory, right? That there's no potential issues that could arise out of

Page 59

that?

A. Correct.

Q. And this is going to way dumb it down, but what you're basically doing is spot checking, right? To make sure that the machines are calibrated correctly, that they're working as opposed to -- the idea being that if one double seam is -- has defects with it, that the remainder of the lot probably has some issues, too?

A. Apologize. I need you to go back and repeat it. No, I missed like your fourth or fifth word.

Q. Sure.

A. I didn't -- I didn't understand what you said. So, then I missed the whole of your question because of it.

Q. Sure. So, what you're doing in this process is spot checking, right?

A. Yes. Yes.

Q. You're pulling out a product --

A. Yes.

Q. -- of many --

A. Yes.

Q. -- to look at it on a detailed level, with the assumption being, if that there is a problem with the double seam in that exemplar product, there's something wrong with the remainder of the lot?

A. Off that particular seaming head --

Page 60

Q. Off that particular seaming head.

A. Yes. Correct. Yes.

Q. How frequently -- you say it's a common industry practice, this is done frequently.

How frequently is this done?

A. Like I said, different industries or different companies even do it at different intervals. It could be every hour, it could be every four hours, could be once a shift or every eight hours. And I know some plants run 12-hour shifts. They might do two then, during that 12-hour period.

Q. You go on to say, "In production, it's typical to only check second operation or final double seams."

A. Yes.

Q. Which would be, essentially, the finished product -- not the finished product per se.

A. I know -- I know --

Q. But it would be the finished can?

A. Yes. I know what you mean. Yes.

Q. Yes.

A. It's the finished double seam.

Q. Not every stage of the process?

A. Yeah. There's two stages.

Q. Uh-huh (affirmative).

A. There's a first operation roll that kind of sets

Page 61

the metal up in its right locations. And then, there's a second operation roll that compresses everything into the final shape. So, the first operation is typically checked when you're -- when you're setting up the machine.

Q. Uh-huh (affirmative).

A. But then after you've set up the first operation and set up the second operation, you start running production. It's typical only to check the second operation seam unless there's a problem. Then you might go back and look at the first operation again.

Q. You say, "It is typical that companies have double seam specifications."

A. Yes.

Q. Specifications for what the finished double seam should test as? Or should be?

A. In that particular instance, what I'm talking about is dimensional specifications.

Q. Uh-huh (affirmative).

A. So how long the seam should be, the seam height, the seam width, the overlap, the body hook, the cover hook, and there's tolerances on all those, as well as the wrinkle rating and the gaps that we talked about.

Q. Go to Section 8, same page.

A. Okay.

Q. You say, "Metal packaging manufacturers and their

Page 62

customers have numerous packaging specifications and drawings, some of which have been mentioned above. These documents list what is acceptable and not acceptable in terms of a component's dimensions and performance. Some of the most critical ones, in this case, are items such as burst pressure, double seam dimensions, defects, et cetera."

This is documentation that you would expect the manufacturer of a product like this to have. Is that what you're saying?

A. No. Typically, the way these are done is the brand owner sets the specifications --

Q. Uh-huh (affirmative).

A. And gives that copy to their supplier, and then their supplier is supposed to meet those.

Q. Okay.

A. And if there's disagreement on those, then they talk and align.

Q. You go on to say, "I requested copies of all this critical information." Why did you use the words "critical information?"

A. Because it's very important to understand those pieces of data.

Q. Because that is what tells you what actually happened in the manufacturing process, fair?

Page 63

A. That tells you part of what happened in the manufacturing process, as it's both dimensional and performance.

Q. If you wanted to understand what had happened to a particular can when it was being manufactured, this is the data you would go look at, true?

A. That is -- it's part of the data.

Q. What other data would you want to look at?

A. Potentially machine settings, materials being used. There's a number of other things, I mean, that I could think of. But I'd probably need some time to think about it.

Q. Uh-huh (affirmative). You say you "requested copies of this information for both the time period before and after the failed can was made and for the day the failed can was made."

Why would you want information before and after?

A. Because I like to see if anything's trending.

Q. Uh-huh (affirmative).

A. So, looking at that one day and that one -- snapshot might not give you a good picture. It's always worthwhile to look at a time period before and after. Could be a week, could be two weeks, could be a month.

Q. And what could a trend tell you, and what would you try to derive from that?

Page 64

A. Could tell you if you're heading to a situation where you're going to be out of specification.

Q. Uh-huh (affirmative). So, I guess, in other words, if you have the data leading up to the day the product you're looking at was manufactured, you could see incremental changes that are getting you away from the required specification?

A. Yeah. And I should also have said "control limits."

Q. Uh-huh (affirmative).

A. So it's both specification and control limits.

Q. You then say, "None of this information was provided by the Defendant." You say, "The Defendant should have all this critical information on file, so they simply refused to share it."

What's the basis for that opinion?

A. That I asked for the information. It wasn't provided.

The way relationships are set up with brand owners and can suppliers is that, like we talked about, the brand owner sets the specifications, the can -- can manufacturer typically is responsible for meeting those. And any -- in every instance I'm aware of, the brand owner is able to go back and ask for that data.

Q. Uh-huh (affirmative).

Page 65

A.  And there's never -- I've never experienced a problem getting it until now.

Q.  Uh-huh (affirmative).

A.  And not all of that -- my experience relates to court cases, either.  I'm just saying, in general, over my 40 years, anytime a brand owner has asked for data from their supplier, there was no problem getting that.  That's a -- a very typical exchange.

Q.  I guess that's -- we're tiptoeing around something here.

Who manufactured this can?

A.  I guess somebody's supplier manufactured the can.

Q.  It was not Energizer, true?

A.  Not to my understanding.  Their supplier made it for them.

Q.  Are you familiar with the company called ITW Sexton?

A.  I've heard of their name, but I wouldn't say I'm familiar with the company.

Q.  Have you heard of their name outside of the context of this case?

A.  Yes.

Q.  Okay.  Do you have any reason to doubt that ITW Sexton is who manufactured this can?

A.  I have no information about who manufactured it

Page 66

other than looking at, like, the patent for the pressure relief device --

Q.  Which is owned by ITW.

A.  Well, that's -- that's why I said that's -- that's one piece of data I have.  The can had a pressure relief device, the patent was granted to ITW Sexton, and so, therefore, that's one piece of data I have that would tend to indicate that they were the manufacturer.

Q.  You don't know anything about the relationship, the business relationship between Energizer and ITW Sexton, do you?

A.  No.

Q.  So you don't know if Energizer has access to that information or not?

A.  They should.

Q.  But you don't know?

A.  They must.  Otherwise, how do they know if their supplier's meeting their specifications?

Q.  That's not the question I'm asking you, though.

You do not know what information Energizer has access to about these cans?  "Yes" or "no?"

MR. FUTCH:  And you can explain.

MR. BIONDICH:  Can you repeat the question?

BY MR. TUTEN:

Q.  You do not know what information Energizer has

Page 67

access to about the manufacture of these cans?

A.  Correct.  But as I stated before, every brand owner I've worked with or been employed by was able to get that information from their supplier.  They're ultimately responsible for what's put on the shelf or sold to the public.  If they didn't go back and ask for that information periodically and check, then I think that's negligence on their part.

MR. TUTEN:  I'm going to move to strike that for responsiveness, as expressing legal conclusions about negligence and other topics.

MR. BIONDICH:  Okay.  Maybe I didn't use the right word, but they should have done it.

BY MR. TUTEN:

Q.  What I'm getting at, is that you have a representation in your report that the defendant should have all this critical information on file, and they just refused to share it with you.

What is your basis for saying that?

A.  That over the history of my 40-year career, every brand owner that's asked their supplier for data got it.  That was whether it was a metal package, a glass package, a paper package.  I've never worked with anybody where the company that supplies them has refused to provide them this information.

Page 68

Q.  When you were drafting this report, you chose to use the words that, "this is critical information," true?

A.  Yes.

Q.  And you knew, at the time you drafted this report, that you did not have access to that critical information?

A.  At that point in time, I did not.

Q.  Did you make any inquiry as to why those document -- you could not obtain those documents?

A.  I asked Ken about it a number of times.

Q.  Right.

A.  If we were going to get it or not.  And I was told that they were refusing to provide it to him.  Or he had not been provided it, one of those.  I don't remember exactly his words.

Q.  Let's go to Section 9, which is background, right below it.  And if you read through this -- and feel free to read it if you want to.

This section is essentially a summary of the plaintiff's interrogatory responses and his deposition testimony.  Is that fair to say?

A.  Yes.

Q.  You are aware that there was another witness to this event, right?

A.  Yes.

Page 69

Q. Who tells a dramatically different story about what happened with this product?

A. Yes. I just found out yesterday.

Q. You just found out yesterday about that?

A. Yes.

Q. So, you did not review her deposition testimony in preparing your report?

A. No. I did not have it at that point in time.

Q. Do you know what --

A. But --

Q. -- that witness says happened with this product?

A. Generally, yes.

Q. And what is that?

A. That Mr. Boatright brought -- bought the product, went outside with it. She went along with him. I think the hood was already open on his vehicle. The car needed to be running when the can was used. He placed it on a radiator shield, went and started the car, came back. About a minute and a half to two minutes had expired, and when he either grabbed the can, or was close to grabbing the can off the radiator shield, the can exploded.

Q. I don't think we're here today to say whose version of events is right, whose version of events is wrong, right?

A. That's --

Page 70

Q. I don't think that's within your purview.

A. Correct.

Q. But as an expert witness, you would agree with me that it's important to consider it when different factual scenarios are presented about what caused the incident, true?

A. It's important to consider it. But, in this case, it doesn't change my opinions.

Q. So, if you were redrafting this report today, would you include that in your background section?

A. I would say that there are two different stories told about how the incident unfolded. Yes.

Q. You've worked with products under pressure for most of your career, fair?

A. Pretty much all my career. Yes.

Q. So you know that the atmospheric temperature, the temperature that the product is exposed to, the amount of product that is within the container -- those all bear on pressure, fair?

A. Yes.

Q. So, when you have -- one person says, "I've used half the product and did nothing else with it," and one person who says, "I've -- used all of the product and sat it on a hot surface," that doesn't change your opinion about what the pressurization of that can was?

Page 71

A. Well, let's back up. I think you said the can -- in one case, the can was empty. In the other case, the can was half empty.

I think -- well, what I recall is, in one case the can was half empty, in the other case the can was full.

Q. That -- that is my understanding. Yes.

A. Okay.

Q. In one case, that -- that's --

A. I just wanted to confirm.

Q. Yes.

A. That -- that was my understanding. I thought you said something different.

Q. Yes. In one case, where the can is half empty, and being held in somebody's hand. The other case, the can is full and sitting on the radiator of a running car.

That has an impact on the pressurization of that product, doesn't it?

A. The pressures in those two situations were likely different. Yes.

Q. So then, how can you tell me that if the pressure of the product is different between different factual scenarios, that has no bearing on any opinion you've rendered?

A. Because the can shouldn't have exploded in either case.

Page 72

Q. Okay. In your 40 years of experience, what percentage of product failures would you say stem from user error?

A. I don't think I'm able to put any kind of a number on that.

Q. Okay. How about environmental factors?

A. I can't put a number on that, either.

Q. Okay. How about this?

Would you agree that product failures stemming from user error or environmental factors are greater than product failures stemming from a manufacturing defect?

A. I don't have that data.

Q. You worked in this industry for 40 years, and you don't have any kind of idea of what the leading cause of your products failing was? Or the cause -- any cause?

A. My work is totally different from being a typical consumer and person.

Q. Uh-huh (affirmative).

A. My work was very technical. I, actually, probably saw more -- I'm sure I saw way more failures that were manufacturing errors than I did user error.

Q. Uh-huh (affirmative).

A. I know that's not what you want me to say, but that's my experience. I don't get involved -- or haven't been involved in consumer errors. When I'm involved, it's

Page 73

normally a manufacturing defect or manufacturing error.

Q. Well, let's go back to talking about your CV, where you told me that you were involved in the technical design, the design, and ultimately sourcing with the manufacturers of these products.

Right? Is that a fair characterization of your career?

A. I said I did not design them. I'm not a designer. I gave engineering input into the design.

Q. What is the distinction between engineering input into the design and the design of the product?

A. The design is either industrial, where it's looking at the form, or it's -- in most of my cases, it was computer-aided design as opposed to a draft board. So that's all the detailed dimensions of everything, cross-sections. I was looking at it more from a performance standpoint.

Q. And that's what I'm having a hard time understanding, is that --

A. Okay.

Q. -- if you are looking at it from a performance standpoint, isn't a driving factor behind engineering a product preventing failures that would stem from misuse by the user? Is that a consideration that you take into account?

Page 74

A. Could you restate that?

Q. Sure. That was a long question.

When you are charged with the technical or engineering design of a product, you're trying to figure out performance.

Isn't one of the first questions you ask, how can we create this product in a way that will not be misused by the end consumer? That will not fail if the end consumer uses it in a certain manner?

A. I would not put it in the same words you did.

Q. Uh-huh (affirmative).

A. I would say the product needs to be fit for use.

Q. Uh-huh (affirmative).

A. So it has to work for its intended purpose.

When I would be providing my input onto the -- the design of a package, I'm making sure that it will meet its performance requirements, the specifications we talked about before.

Q. Sure.

A. As well as, we always try to incorporate some type of a factor of safety into the design.

I will say, you cannot predict what a consumer will do with the package. I have watched people do things with packages, and I have no idea how they ever came up with their idea to do what they did.

Page 75

Q. Uh-huh (affirmative).

A. So, no. I don't -- do not design -- I've never designed a package trying to take into account how somebody might misuse or abuse the product. I've always designed it according to the performance specifications and tried to have a safety factor and make sure it was fit for use.

Q. Well, maybe we can agree on this.

Products are misused by the end user. Fair? But --

A. Not in all cases.

Q. But --

A. Probably.

Q. You're aware of instances where a product was misused by an end user that contributed to the failure? You just told me that --

A. Yes.

Q. "I can't believe I saw some of these things that happened."

A. Yeah. It didn't fail, it wasn't a package failure, but somebody did something with the package. I was like -- couldn't believe they had done. It was in a consumer research session --

Q. In your experience, what is the typical rate of a manufacturing defect that would be -- strike that.

Manufacturing defects happen, right?

A. Yes.

Page 76

Q. That happens.

In your career and in your experience, what is the ratio that you are shooting for, the acceptable ratio of a when a manufacturing defect might occur? Is it 1 in 10,000 products, 1 in 100,000 products? What does that look like?

A. Typically, manufacturers are shooting for zero.

Q. Well, sure.

A. Right?

Q. Uh-huh (affirmative).

A. I don't know their numbers that they actually hit. But it's low -- generally low.

Q. When you were at Coca-Cola, did you know what the number -- strike that.

When you were at Coca-Cola, did you have any knowledge about what the incidents of manufacturing defects was for the products that you were working on?

A. No.

Q. That information was never conveyed to you?

A. No.

Q. Did you ever try to find out?

A. No. That was not part of my job responsibility.

Q. But you'd agree with me, in most instances, that rates of manufacturing defects are very low as a portion of total products that are made?

A. Yes.

19 (Pages 73 to 76)

Page 77

Would this be a good time for a break or should -- are you close to finishing up a section? I just thought I'd ask.

MR. TUTEN: No, we can take a break.

THE WITNESS: Okay.

MR. BIONDICH: If you're ready, yeah.

THE WITNESS: I could use a break.

MR. TUTEN: Yeah. Let's take five minutes.

THE WITNESS: Okay. Thanks.

MR. TUTEN: Off the record.

(Whereupon, a discussion ensued off the record.)

BY MR. TUTEN: (Resuming)

Q. We are back on the record.

We were talking about the background section of your report, which omits the witness to the incident's testimony.

Are you aware that this product had a warning label on it?

A. Yes.

Q. You know what that warning label said?

A. Not 100 percent.

Q. I'll tell you. It says, "Do not leave in a vehicle. Do not store in a temperature over 120 degrees Fahrenheit."

Does that sound accurate?

Page 78

A. Yes.

Q. So, knowing that, you don't think it matters that a witness testified, in this case, that the plaintiff exposed the product to a high temperature?

MR. FUTCH: Objection to the form.

MR. BIONDICH: Yeah. I don't -- no, I don't. It doesn't change my opinion, and I don't think that the can was exposed to a high temperature.

BY MR. TUTEN:

Q. But you don't know what the -- what happened to the can?

A. You need to say more. I don't --

Q. You don't know --

A. -- know what you're asking me. Sorry.

Q. You do not know what actually happened at the Advance Auto Parts in Blackshear that gave rise to this incident?

A. I mean, what were the events that took place?

Q. Yes.

A. Like, what happened at what point in time?

Q. Yes.

A. No.

Q. And you --

A. I just -- I just have the two depositions to look at.

Page 79

Q. You have no personal knowledge of it?

A. Correct.

Q. And you don't know if the can was exposed to a heat source or not?

A. I'd say, probably was.

Q. No. You just told me that the can -- you -- you said --

A. No. I think you asked a different question.

MR. TUTEN: Okay. So -- well, let me -- have -- read back -- I don't know how far we need to go back. It's probably about six questions ago now.

(Whereupon, a discussion ensued off the record.)

BY MR. TUTEN: (Resuming)

Q. That's fine.

THE COURT REPORTER: Okay.

BY MR. TUTEN:

MR. BIONDICH: So, I still agree with that. The second time you asked me the question, you asked about a temperature source.

BY MR. TUTEN:

Q. Okay.

A. To me those are -- you were classifying --

Q. Sure.

A. -- previously as a high temperature. I would agree there was a temperature source, but I can't say it

Page 80

was a high temperature source.

Q. Well, you said you don't think it was exposed to a high temperature source. So how do you know that?

A. I don't think that's what I said either. I'm saying it --

Q. You said you don't think --

A. Okay. Wait.

Q. -- the can was exposed to a high temperature.

A. It was exposed -- it wasn't exposed to a high temperature source, but it was exposed to a temperature source.

Q. Okay. How --

A. So --

Q. How can you make -- how can you draw that conclusion?

A. The car had been running prior to Mr. Boatright going to Discount Auto Parts, so the engine was warm. He placed the can on top the radiator shield. The radiator was likely warm. He started the car, and then came back to get it, and that's when Jenna (ph) said the explosion occurred.

So, the radiator would be a heat source if it was above ambient, but you have an airspace between that and the radiator shield, typically. I don't know in this particular case. You have something in between the can and

Page 81

the radiator. So the radiator would be the heat source, then you have the can. There's something in between there that will act as a bit of an insulator.

Q. And, again, there's no mention of any of that in your report or how it bears on your conclusions or any other aspect of the opinions that you've reached in this case. You have no -- made no consideration of that in your report? Is that fair to say?

A. I haven't documented that in my report. But now that I've read the deposition and looked at her version of the circumstances, it doesn't change my opinions.

Q. Okay. You say at the bottom of this paragraph on page 19, last paragraph, "The coupler hose separated from the can when they blew up."

How do you know that?

A. I believe I read that in some of the documentation.

Q. Okay. Do you have any knowledge if this product came with a coupler hose?

A. When I've used it previously myself, it did. That would be my only knowledge. And then, what the people are saying in their accounts.

Q. You're aware that there are different versions of EZ Chill, true?

A. Yes. But I couldn't say what they were.

Page 82

Q. Okay. I'm going to say both of Mr. Boatright's hands were injured when the can burst. It includes some pictures. A couple pages of pictures show how Mr. Boatright's hands were injured by the exploding can of EZ Chill and list his injuries.

Do you have any medical training?

A. Not -- excuse me. Not other than basic first aid.

Q. So, your description of Mr. Boatright's injuries are not your opinions?

A. No. They're what I read.

Q. And they came from medical records, or from other documents?

A. Yes.

Q. Have you ever experienced a product under pressure failing like this, personally?

A. Other metal packages, yes. Not a can of EZ Chill.

Q. Okay. What other metal packages have you had that experience with?

A. Soft drink cans, coffee cans. And then, I've done performance tests on beer and beverage cans, food cans, aerosol cans where we're intentionally trying to blow them up.

Q. Have you done a performance test in this case?

Page 83

A. I'm not sure what you're asking me. Could you, like, reword it?

Q. Have you done a performance test, in this case, where you tried to recreate the explosion?

A. No.

Q. Again, your report keeps talking about the incident report that was filed by Ms. Lake (ph). You say, "The incident report stating both of Mr. Boatright's hands were injured is consistent with the pictures of his injured hands."

I'll just ask again, you have not sought to render any medical opinions, true?

A. Correct.

Q. Okay. And you don't know what the extent of Mr. Boatright's injuries are, true?

A. No. Other than looking at the pictures and seeing where the incident report had both sides of his hand circled.

Q. Have you talked to Mr. Boatright about this case?

A. No.

Q. Have you talked to any fact witness about this case?

A. No.

Q. Section 10, it's titled, Pressure Relief Device. And you say, "As previously mentioned, the failed can was

Page 84

made under a special permit, namely DOT-SP 10232. This permit relates to the use of a pressure relief device, or PRD, in the bottom of the can."

And that is, if you look at the can, which is depicted in image 22, that is the device in the center of the can's bottom, true?

A. Yeah. It was like a scored crescent shape.

Q. Yeah.

A. Or arc. Yeah.

Q. Sure. What is the purpose of a pressure relief device like this?

A. To prevent the can from failing catastrophically and bursting.

Q. And how does it achieve that?

A. By putting that arc-shaped score in the bottom of the can, it weakens the bottom of the can. And if the can does become over-pressurized, then that weakened metal will actually fracture and release the contents of the can through that cracked score line.

Q. Uh-huh (affirmative).

A. Now, it's still -- still dangerous. Because now you have, basically, the -- the aerosol can acting as a missile until there's no more energy in the can, but it's not as violent as this -- the can catastrophically blew up. So it's more of a controlled failure.

Page 85

Q. I asked you this earlier, more generally, and I'll ask you in a more refined way now.

Have you been involved in the design, engineering, manufacture of a product containing a pressure relief device?

A. I can't say that I can recall being directly involved in the development of one.

Q. I think you told me earlier, and I don't want to put words in your mouth, that you had been involved with products that contain a pressure relief device in your consulting work, but maybe not in your career before that. Is that a fair --

A. Well, yes. But I was also trying to make a distinction between me interacting with the pressure relief device --

Q. Uh-huh (affirmative).

A. -- versus me developing the pressure relief device.

Q. Sure.

A. I thought the last question you asked me, you asked me if I had developed them.

Q. And that was what I was getting at.

A. I -- I have not developed one.

Q. Okay. But you -- you've used products with pressure devices?

Page 86

A. That I've -- yes.

Q. Sure. Are pressure relief devices common in aerosol products now?

A. They are not as common as they once were.

Q. Uh-huh (affirmative).

A. Some of them have had problems and have been taken off the market. So, I don't actually know, like, as a percentage, how that's changed with time. But I know there have been some pressure relief devices on aerosol cans that have been removed.

Q. Uh-huh (affirmative). Do you know what products those were, that pressure relief devices were removed from?

A. The ones I'm aware of involved cooking sprays. And what was happening is when they did over-pressurize and this pressure relief device vented, now you had a spray coming out. And, typically, these products are used in the kitchen --

Q. Uh-huh (affirmative).

A. -- around heat sources or flames.

Q. Yeah. And that --

A. And what resulted was an explosion.

MR. FUTCH: Flamethrowers.

THE WITNESS: Yeah.

BY MR. TUTEN:

Q. You say, "On March 3rd, 2015, a United States

Page 87

Patent was granted for the pressure relief device that was used on the failed EZ Chill can in this case. The purpose of the pressure relief device as stated in the patent is to safely evacuate the contents inside the aerosol can in the event of a pressurization," which is what we just talked about, right?

A. Yes.

Q. That's their function --

A. Except they use the word "safely." Like I said, it's still semi-dangerous.

Q. Uh-huh (affirmative).

A. Because you have a projectile.

Q. Then, a few sentences on, you ask, "Why did the pressure relief device not activate? If the can was indeed over-pressurized, then the pressure relief device should have activated. Since the pressure relief device did not activate if the can was over-pressurized, then the pressure relief device was defective."

How did you reach that conclusion?

A. So according to the DOT specifications, from 0 to 380 PSI, the can is supposed to be okay. It's not supposed to fail. It's not supposed to burst. It's supposed to stay intact. Between 380 and 480, the pressure relief device is supposed to activate.

Q. Uh-huh (affirmative).

Page 88

A. And then, above 480, the can is allowed to burst.

Q. Uh-huh (affirmative).

A. So, what I'm saying is, if the pressure got above 380, the pressure relief device should have activated, and it did not. And, therefore, it would have been -- it's defective.

If the pressure was below 380, the can should not have burst because a can is not allowed to burst until it's above 480. So, if it bursts below 380, then the can didn't meet specification again, and therefore it's defective.

So, it doesn't really matter what pressure the can failed at. It was defective.

Q. You don't know what pressure the can was at, true?

A. True.

Q. You've run no tests to try to figure out what pressure the can was at?

A. I've not run any tests. But I asked for data to see what their cans typically fail at.

But like I said, the actual pressure it failed at is irrelevant.

Q. You say, going down to the paragraph starting below image 25, "For this pressure relief device to function properly and activate at the correct internal can pressure, it is critical that the score be properly

Page 89

formed." And you go on to discuss this in your report.

But just tell me, what is "the score?" What do you mean by that?

A. The score is the defect, the design defect that's put into the bottom of the can with this arc or crescent shape. You have a tool that's called a score knife. It's got certain geometry to it, and then you push that so far into the metal. And underneath that score tool, what's left is called a score residual. So, the included angle of the score, the face of the score, the depth of the penetration, the residual underneath, as well as the sharpness of the corners of the score are all important in terms of that score line performing properly.

Q. Just be careful with the word "defect" in the -- in this circumstance.

A. I --

Q. Defect, you mean?

A. I don't -- I don't remember where I used it.

Q. You said that the -- "the score is the defect in the can."

A. Oh --

Q. What you mean is by the -- it's in it's opening that's made to --

A. Okay. Sorry. I'll restate it.

Q. -- effectuate the pressure relief device.

Page 90

A. I will call it a design failure point.

Q. Uh-huh (affirmative).

A. Is that okay?

Q. That's fine. The design failure point.

A. I meant a design -- yeah. Yeah. A design failure point.

Q. Okay. You say, "If the score residual is too thin, the pressure relief device will activate prior to the prescribed pressure target. If the score residual is too thick, the pressure relief device will not activate at the prescribed pressure target and thus activate at a higher-than-specified pressure or not activate at all."

The "score residual" is something that is measured in quality control, true?

A. It should be. Yes.

Q. And if you reviewed that data, then you could say the score residual is too great or it is not -- not big enough. True?

A. If I was able to review the data, I could say whether it was in the control limits or within the specification limits.

Q. And you have not reviewed that data?

A. Again, that's data I requested and did not receive.

Q. Well, that's not really what I'm asking you,

Page 91

okay? You did not review that data?

A. I did not review that data. But I asked for it and did not receive it.

I also say, "It's not only the score residual that is critical for the pressure relief device to activate at the specified pressure, but also the shape of the score."

Q. You say, "A new score knife has sharp corners when viewed in cross-section. These sharp corners act as stress concentrators, causing the metal to fracture in these corners. It is the fracturing of the metal in the score that allows the pressure relief device to activate."

As the score knives are in use for a period of time, they wear out, right? And the score grooves will start to fold in. Is that -- is that a fair --

A. Yes.

Q. -- recitation of what you're -- what you're saying?

So you say, "It's critical when manufacturing score grooves that because metal to fracture and open at a prescribed location that the tools themselves be monitored and replaced as they're wearing out."

A. Yes.

Q. And that's also information, data that's tracked in quality control, quality assurance processes, in your experience?

Page 92

A. Yeah. Sorry, I missed the front end of your question. Could you restate it?

Q. Sure. The -- how sharp these knives are, how -- what the score residual is, what the geometry is of the score itself is tracked or is trackable through quality control processes?

A. Yeah. So the score tools are normally manufactured to a drawing.

Q. Uh-huh (affirmative).

A. The score residual has control limits or specifications. Or it has specifications, but then the control limits are how you're actually operating, so it has those around it. Score residuals are typically measured and tracked, and it's also important to occasionally look at cross-sections of the score.

So, like we talked about looking at the cross-section of the double seam, you want to look at the cross-section of the score to make sure that you're not getting any cracks occurring. You can get cracks with a new score knife off the corners, or you can get -- excuse me -- cracks off a dull score knife right in the center of the score.

Q. Uh-huh (affirmative).

A. These plants that make scored products out of metal have typically been doing it for so long that they

Page 93

know -- up -- and also about when the score tools need to be replaced. So they keep track of how many hits are on the score tool and replace it after so many hits, which could be a certain length of time.

Q. You say, "I requested the score geometry and score specifications. Like the dimensional and performance specifications, these were not provided by the defendant. Thus, I was unable to determine the PRD score on the failed can -- if the PRD score on the failed can was made properly or not."

A. Right. It could have been if I got the information, I would've concluded it was good. But I didn't get the data.

Q. So, you can't --

A. I don't -- I don't know.

Q. And that -- that's I think what my question is. You don't know if the PRD score was proper?

A. No.

Q. You don't know if the PRD residual was proper? The score residual was proper?

A. Correct. I just know it didn't activate if it was supposed to, or it didn't activate and the can burst prematurely.

Q. Section 11, it's titled Examination of the Failed Can. You said, "I've had the opportunity to examine the

Page 94

failed can."

What did your examination of the can consist of?

A. I did a visual examination of the can, and then I also brought it to a lab in Atlanta and had them do a CT scan.

Q. I think those are -- that CT scan is documented in the communications we received right before the deposition began.

What I will say is, looking at Attachment C to your report, which is on page 30 -- starts on page 30. I don't see anywhere on here that says you reviewed a CT scan of this can.

A. That's correct. I forgot about it. And when you sent me the subpoena for the deposition and gave me the list of materials that you wanted, I think somebody on your side picked up that in my time sheet I had a company called SpecTest, and I went back and retrieved all those e-mails, and I think there were two CT scan images and the quote for the work.

Q. Uh-huh (affirmative).

A. And I provided those, yes, within the last day or two.

Q. And the CT scan is also not mentioned in the examination of the failed can section of your report, true?

A. Correct. I --

Page 95

Q. Or anywhere else in your report?

A. Correct. And that did not factor into my opinion because if you take a look at the photograph, you'll see it was very, very blurry.

Q. Uh-huh (affirmative).

A. There was nothing I could tell from the -- the CT scan.

Q. And that was going to be my next question is -- is it not mentioned because you didn't really derive anything from it?

A. It -- there was nothing I could get from it.

Q. Okay. You say, "As seen in the pictures above, the can failed catastrophically. Mr. Boatright is lucky his injuries were not more severe than they were. It is important to note that a store employee selected the can that exploded, not Mr. Boatright."

Why is that important to note?

A. That's the version of the story I had, and I thought it was important in case you wanted to say, well, Mr. Boatright picked out the can himself off the shelf.

Q. Uh-huh (affirmative).

A. As opposed to Jenna Lake picking it out. So we don't know, at this point in time, who picked it out.

Q. You say, "It is difficult to ascertain exactly where the can failure started."

Page 96

Why is that difficult to ascertain?

A. Because this can is so destroyed.

Q. Have you made any attempt to reconstruct how the explosion unfolded outside of the testing that we talked about earlier, that you did not do?

A. I examined the can and had -- I came to a conclusion that I believe -- I'm trying to think of the right words to say this. That it's likely that the can failed by the double seam pulling apart at the bottom of the can.

Q. Uh-huh (affirmative). And what makes you believe that is likely?

A. Because the amount of metal that was pulled out of the double seam. It was, I mean, a significant amount around the circumference of the can. And if, like, a fracture had generated in another part of the can, it's easier to keep fracturing the metal and propagating the crack than it is to create another failure point.

Q. Uh-huh (affirmative).

A. So, if it had cracked somewhere, it would normally just continue to propagate, maybe propagate in another direction, because that's what happened with this can. I mean, there were cracks propagating in multiple directions. It's possible it could make it down to the double seam and for some of the double seam to unravel.

Page 97

But based on the amount of the double seam that I saw that had unraveled, I came to the belief that that's where it failed first.

Q. But you didn't run any tests to make that determination? It's just based on your --

A. No. It's --

Q. -- visual examination?

A. Correct.

Q. When did you examine the can?

A. Late last year.

Q. Sometime before this report was --

A. Yes.

Q. -- issued in late -- in early November?

A. Yes.

Q. Do you know if the can, as you examined it, looks the same as it did on the day of the incident?

A. No.

Q. Do you know what the chain of custody has been for that can?

A. I believe I do. But this is going, again, by -- deposition testimony.

Q. Uh-huh (affirmative).

A. So, I think Mr. Boatright said that within a few days, he turned over the can to Ken. And then, at some point in time late last year, Ken gave it to me. And now

Page 98

I'm giving it back to Ken.

Q. Had -- do you -- have you had possession of the can for longer than the time that your visual examination took?

A. Yes.

Q. Okay. How did you store the can?

A. It was stored in a dresser, in an empty shelf or empty drawer --

Q. Okay.

A. -- in my office.

Q. Okay. Did you perform any kind of destructive testing on it?

A. None.

Q. Any other kind of testing on the can itself?

A. Just that CT scan.

Q. The CT scan that was --

A. Observation of the can and the CT scan.

Q. You go down to say, "It is common for double seams to fail if the double seam is not properly formed or the double seam is short of meeting critical dimensions." Right?

A. Yes.

Q. When you say, "common," how common is that to happen?

A. If you have a short overlap or something, it's --

Page 99

Q. Yes.

A. It would be very common.

Q. Okay. What does "very common" mean? I'm looking for like a -- a ratio. I mean, one in five, one in ten. What --

A. Under what conditions are you asking me if it would fail?

Q. That's a good question. Because the conditions matter, right?

A. So, I'm saying if I tried to burst it --

Q. Uh-huh (affirmative).

A. Take it to its burst pressure. Or, in this case, pressure relief device activation pressure.

Q. Uh-huh (affirmative).

A. If the score residual -- sorry. I said the wrong thing. If the overlap is below specification, that will likely, most likely fail.

Q. Uh-huh (affirmative).

A. I would say 75 to 100 percent of the time before you get to the burst pressure --

Q. If you're trying to get it on purpose, right?

A. Yes.

Q. How common is it for a product in daily use to get to a pressure of 480, the burst pressure for what this product would be?

Page 100

A. I'll just be speculating, but I'd say highly unlikely. But I have no data.

Q. Because that's a pretty high pressure, right?

A. It is.

Q. You say in this section, "I requested double seam data for the day the failed can was made and for several days before and after the can was made, and the data was not provided by the defendant. Thus, I was not able to determine if 'good,'" in quotes, "double seams were being made or not."

So, you did not review data relating to the double seam of the manufacture of this can?

A. Correct. It's the same as the score and the burst pressures that we talked about. I requested the data. I didn't get it. If I got it, it might have said that the double seam was good. I don't know.

Q. It might have said the double seam was good, right?

A. Pardon me?

Q. It said it -- the data. The data might have said the double seam was good.

A. Right. I don't know.

Q. You don't know.

A. It could have been good.

Q. And that's --

Page 101

A. It could have been bad.

Q. Right.

A. Then it would have given me more data to work off of, but I don't know.

Q. But you can't say. So, any attempt to say anything about the quality of the double seam is speculation without that data?

A. I don't think I said anything about the quality of the double seam.

Q. Well, how about the quality or the performance of the pressure relief device?

A. I don't think I said anything about that, other than it either activate -- did not activate when it should, or the can failed below that activation pressure, and it's not supposed to burst there.

Q. Okay. You say, "I also requested numerous pieces of test data from the day the failed can was made," this is in the next section, "as well as the days preceding and following that date. This was also not provided by the defendant. One of the most important of these would have been the buckle burst data for the can bottom with and without the pressure relief device."

A. Yes.

Q. I think we've talked about why that's important, right?

Page 102

A. Well, first of all, it's a repeat from before. And, yes, we've talked about it. But this can failed by bursting, so having the burst data would have been useful.

Q. Just like it would be useful to have the PRD data, right?

A. Yes.

Q. Just like it would have been useful to have the double seam data, right?

A. Yes.

Q. And you've looked at none of that?

A. I was not provided any.

Q. That's not the question. You have looked at none of that data?

A. I have -- I haven't looked at any because I wasn't provided any.

Q. Okay. You go on to say, "Extremely limited test data, performance and dimensional, was provided by the defendant, and it was only for the day the failed can of EZ Chill was manufactured." And you repeat, and these are your words, "None of it was the data most important to this case."

A. Correct.

Q. You would agree with me that you have not reviewed the data that is most important to this case?

A. Correct. Because I asked for it and it wasn't

Page 103

provided.

Q. You go on to say, "Also, the sample sizes were very small. It is very difficult to determine if a sample population meets the specifications when the sample sizes are so small. Specifications and data were missing for the burst pressure, which is a critical performance characteristic. The DOT sets limits for frequency with which cans need to be tested for bursts, yet the defendant refused to provide this data."

We've talked about that before?

A. Yes.

Q. "Similarly, specifications and data were not provided for double seams. Also, data was not provided for the PRD, which is important as it did not activate prior to the can failing catastrophically."

Which is, again, is repeats of what we talked about before. You did not look --

A. Yes.

Q. -- at this data.

So, then you talk about the data that was provided. And this comes from Energizer's quality assurance documents from their Dayton plant that we produced in discovery. That includes the water bath temperature, the product lot code verification, the valve height, liquid filler, material verification, crimp diameter, crimp depth, gas

Page 104

weight, valve height, vacuum, et cetera.

And you have observations about this data, right?

A. High level observations. Yes.

Q. Is it fair to say that this data does not really tell you anything about the manufacture of the can itself?

A. It tells you something about the can.

Q. Okay. What does it tell you?

A. What these categories of information are. So, the water bath temperature is -- they run a filled can through that, so it tells you what that data is. And production lot codes. It's what each of these categories are.

Q. I guess it's important --

A. And that --

Q. Go ahead.

A. Okay. Yeah. I said my analysis of this was at a -- a higher level.

Q. And, I guess it's an important distinction to make, right? Is that what we really have here is a can or shell, that is then filled with something, and that becomes the product, right?

A. Yes.

Q. And your opinions relate to the manufacturer of the can or the components of the can. Fair?

A. My opinions relate to the performance of the

Page 105

filled can.

Q. Which of your opinions are specific to the performance of the filled can versus the failure of an individual component of the can itself?

A. Could you state that --

Q. Sure.

A. -- another way? What you want me to distinguish between?

Q. You have just told me that your opinions relate to the performance of the filled can.

But when I look at the Conclusion section of your report, you are identifying specific components of the can which you believe are defective. Is that fair?

A. We could go through them one at a time, if you want, and talk --

Q. And we will certainly do that. But --

A. Okay. Do you want to do that now or later?

Q. Well, let's do it later.

A. Okay.

Q. Just get -- have you -- let you have some anticipation.

A. Okay.

Q. Because I'll forget to come back to something. I don't want to have to go in circles and keep you here longer than we've already kept you here.

Page 106

So, let's walk through your high-level observations of the data you did receive.

You say that "For the water bath temperature, 7 of the 26 data points were above the upper specification limit." True?

A. Yes.

Q. How far above the upper specification limit were those data points?

A. I don't recall.

Q. Were they more than five degrees?

A. I don't believe so.

Q. Okay. Would you agree with me that a temperature in the water bath that is five degrees above spec would not compromise the integrity of the container?

A. No. You could actually have cans failing at that point.

Q. Okay. Is it your opinion that this water bath temperature has any bearing on what caused the failure in this case?

A. Could you restate that for me, please?

Q. Do you believe that the water bath temperature had any bearing on the can failure in this case?

A. No.

Q. I'm going to jump down to Gasser Weight, where you say that "It's unusual for the specification to have

Page 107

two numbers." True?

A. Yes.

Q. Are you aware of how this container is filled to make the EZ Chill product?

A. For this product, having two specifications is typical, but that's not typical for most specifications.

Q. Okay.

A. Yeah.

Q. Under Liquid Filler Weight, you said, "These weights had an extremely large range from 6.5 to 8.9," and you characterized it as "huge."

A. Yes.

Q. "Demonstrating a lack of control in fill weights."

What is your basis for that opinion? Or for that observation?

A. All the other packages I've worked with over my career and the specifications around those for filling them.

Q. You understand that the liquid additive we're talking about here, which is the oil and the UV dye that goes with the R134A, is a fraction of a percentage of this product, right?

A. I'd have to review that information again.

Q. Why do you believe that the material lot codes

Page 108

are suspect?

A. Typically, when you're manufacturing, your lot codes come in one after another after number (sic), and the lot codes are somewhat sequential. These were quite a bit out of any type of a numbering sequence, which indicated to me that old materials were pulled and used in this case. Unless there's different suppliers and they have different lot codes that are very different from one another. But I didn't see that within the data.

Q. Do you have any basis for that observation beyond that's just not how you've done it in your experience?

A. I haven't seen anybody do it that way.

Q. Do you have any information to be able to trace these lot numbers to -- back to specific products, to show that you -- or to illustrate the point that you're trying to make, where you think they're pulled from different time periods?

A. No.

Q. So this is just speculation? Beyond, this is not how you're familiar with it?

A. Correct.

MR. TUTEN: Okay. All right. It's 12:48. If you want to take one more five-minute break, get through these conclusions, and I think we'll be about done.

27 (Pages 105 to 108)

Page 109

THE WITNESS: Okay.

(Whereupon, a discussion ensued off the record.)

BY MR. TUTEN: (Resuming)

Q. We are back on the record.

I'm looking at page 25 of your report, Exhibit 5. The very bottom is titled, Section 13 Conclusions.

I'll just ask you at the outset, are these all of the opinions that you have rendered in this case?

A. Yes.

Q. Are these all the opinions that you intend to render in this case?

A. Unless there's new information that becomes available.

Q. I'm going to jump around some of these, because I think we'll have to talk about some of them more than others. Let's go on page 26.

A. Okay.

Q. And there are some things in here, like I'm looking -- for instance, "The Advanced Auto Parts store manager witnessed the catastrophic and unexpected can failure."

That's not an expert opinion, true?

A. I guess it's a fact.

Q. And you are not a fact witness in this case, true?

Page 110

A. Correct.

Q. And you have no firsthand knowledge of what happened at the Advance Auto Parts that day?

A. Correct.

Q. I think that bears on this next conclusion. "Immediately -- the fit of the can onto Mr. Boatright's vehicle was determined to be good by the store manager, the pressure after dispensing half the contents was determined to be good. Approximately half the can's contents were emptied into Mr. Boatright's vehicle."

That is a factual assertion that is contested, true?

A. Yes.

Q. And you have no firsthand knowledge of that --

A. Correct.

Q. -- fact?

A. Yes.

Q. And we've talked about the can that they -- was provided by the Advance Auto Parts store manager previously.

That -- that's not something that you have direct knowledge of?

A. Correct.

Q. That's a factual assertion, not an opinion of yours.

You say, "Both the front and back of Mr. Boatright's

Page 111

hands were injured when the E-Z Chill can violently failed, as evidenced by photos of his hands in the incident report."

That's a factual assertion to the extent that you're talking about Mr. Boatright's injuries. You do not express any opinion on those, true?

A. Correct.

Q. "An explosion of the can was so forceful it caused the coupler hose to separate from the EZ Chill can, for the whole can body to tear apart."

That's probably -- well, I'd say that entire thing is probably a factual assertion, true?

A. Yes.

Q. Not an expert opinion?

A. Correct.

Q. Going back up a little bit, you say, "A can of EZ Chill unexpectedly and catastrophically exploded while Mr. Boatright was simply holding the can in his right hand."

That's a factual assertion, right?

A. Yes.

Q. It's not an expert opinion of yours?

A. Correct.

Q. All right. Jumping back down a little bit, you say, "The can was manufactured under two special permits issued by the Department of Transportation, those being

Page 112

permits 10232 and 14188."

We've talked about that -- those permits, right?

A. Yes.

Q. How you have no independent evidence or independent knowledge that 14188 applies to this product, true?

A. Correct. I just saw it in the document.

Q. You go on to say, "Two aspects of 14188 relate to the metal container to be conforming to Interdynamics Incorporated drawing numbers IDLC001 and IDLC001.1B, having minimum thickness of 0.019 inch and 0.011 inch for aluminum and steel, respectively." You say, "These drawings were requested and not received."

That is not an expert opinion, is it?

A. No.

Q. It's a remark on what you reviewed or did not review?

A. Correct.

Q. And if you assume with me that 14188 is not applicable to this product, neither are these drawings that you reference in the remainder of this conclusion, true?

A. Could you break those into two pieces, maybe? Your question?

Q. Yeah. Absolutely.

A. Yeah.

28 (Pages 109 to 112)

Page 113

Q. Yeah. That was a long question.

I'm asking you to assume that 14188 is not applicable to this product. Fair?

A. Okay. Yes.

Q. If that is the case, then these drawings that you reference in the remainder of this conclusion also have no bearing on this product, true?

A. I would still like to see product drawings, regardless.

Q. "The can contained a pressure relief device in the center of the can bottom. The pressure relief device is covered by patent US 8967411. Its patent number was printed on the side of the can."

Those are factual assertions, true?

A. Yes.

Q. That's not your expert opinion that it was covered by a patent?

A. Correct.

Q. You said, "The most pertinent drawing specifications and test data were not provided by the defendant," true?

A. Yes.

Q. And you stand by that? "The most pertinent information was not provided."

A. Yes.

Page 114

Q. And you have not reviewed it?

A. I can't review it if I don't have it.

Q. That being said, that's a factual assertion, right? This is what you've reviewed or have not reviewed?

A. Yes.

Q. It does not bear on any expert opinion about this case?

A. Correct.

Q. Let me ask that a different way.

It is not your expert opinion that the most pertinent data was requested and was not provided by the defendant? That's a -- an assertion that you're making?

A. It's not a --

Q. I'm not trying to confuse you.

A. -- expert opinion.

Q. Yeah. That's -- I'm not trying to confuse you.

A. Yeah.

Q. That statement is not an expert opinion?

A. Correct. Yeah. That I'll agree with.

Q. "The data provided by the defendant was limited and had small sample size."

Same deal?

A. Yes.

Q. Not an expert opinion?

A. Correct.

Page 115

Q. "Many data points were not in specification."

You've told me, earlier, that -- those data points not being in specifications do not bear on the opinions that you formulated in this case. Is that -- do you stand by that?

A. Yes.

Q. Okay. You say, "No SPC charts were provided for critical data, either."

What is an SPC chart?

A. A statistical process control. So, you're looking at your specifications and plotting your data with respect to time. Because even though your data points may be within specification, this process could indicate that your -- okay. I got to back up because I'm going to use the word "process" twice. This technique of SPC could indicate that your process, manufacturing process, is going out of control or is out of control.

Q. Hence, the second sentence, "Thus, one cannot ascertain if their process was in control and capable."

A. Correct. SPC is another technique that companies use to gather data and keep their process within limits and to make sure they're producing good product.

Q. But that is not an expert opinion? That's just a --

A. It's a fact. Yes.

Page 116

Q. You say, "The data was not provided for the types of testers used or when the testers were calibrated. Thus, one cannot determine if the testers in use were appropriate for the application or if the value shown on the tester was believable."

Is that an expert opinion?

A. No.

Q. Okay. Now I'm going to jump back to the beginning. In second opinion, you say -- second conclusion, you say, "The can was manufactured with a press relief device in the bottom. The purpose of the pressure relief device is to activate prior to the can bursting and thus prevent a violent failure. It is critical to understand the can is designed so the PRD fails first."

Is that a factual assertion or an expert opinion?

A. That's factual.

Q. You said, "PRD is designed to activate at a minimum internal pressure of 380 PSIG and below, the burst pressure of the can without a pressure relief device. The can without a pressure relief device must hold 480 PSIG minimum. Thus, the can is not supposed to burst violently -- burst or violently rupture until the pressure is 100 PSIG greater than the pressure which the PRD activates."

Is that a factual assertion or an expert opinion?

A. It's a fact.

Page 117

Q. That's something you could glean from reading the patent application, true?

A. Yes.

Q. Or the DOT Special Permit?

A. Yes.

Q. And you go on to say -- I think I've narrowed it down now to what your expert opinions actually are, is what we --

A. Yeah. When I say, "conclusions," that was facts and opinions.

Q. Sure.

A. So, I was wondering when we're going to get to the point where we're down to those that were left.

Q. You say, "If the can was over-pressurized to 380 PSIG or more, and we know for a fact the PRD did not activate, thus the PRD in the can was defective."

A. Yes.

Q. That's your opinion?

A. Yes.

Q. What method did you use to reach that opinion?

A. I'm not sure what you mean by "method."

Q. How did you formulate that opinion?

A. I looked at what happened to Mr. Boatright. I looked at the can exploding. I formed -- well, actually, I looked at all the data that was provided. So, there was

Page 118

documents, I don't know what you call them, back and forth between your parties. There were pictures, the can itself. There are a number of pieces of data.

So I collected all that data and reviewed everything, analyzed that data, and then looked at potential causes for the accident, or things that could have happened. And narrowed it down to the pressure relief device or the bursting.

Q. Did you conduct any kind of scientific test on the product, or in any other way connected to this case, to reach your conclusions?

A. I conducted one test.

Q. What was that?

A. That we talked about, the CT scan. And that did not factor into my opinion.

Q. Okay.

A. Would you call measuring the can thickness a test?

Q. Sure.

A. So then, I did that as well. I checked the gauge of the can.

Q. You checked the gauge of the can. How did you do that?

A. With micrometers.

Q. And what was the -- what was the thickness --

Page 119

A. It was above --

Q. -- of the can?

A. It was above specification. I don't remember what the --

Q. It was above specification?

A. Yes.

Q. Okay.

A. Yeah.

Q. What parts of the can did you test the thickness of?

A. Around the sidewall.

Q. Okay. You go on to say, "If the can was not over-pressurized to 380 PSIG or more, the pressure which the PRD is designed to activate, and the can bursts well below the 480 PSIG burst specification, this also makes the can defective."

True?

A. Yes.

Q. And how did you reach that opinion?

A. The pressure activation device is supposed to go off at 380. If it was working properly and the pressure got above 380, it would have activated, but it did not. And therefore, it failed below 380 or even below 480, and it's not supposed to burst before -- below 480.

Q. So tell me this. Okay.

Page 120

Did your testing of this product, and I use "testing" very, very widely, the methods that you employed to reach your conclusions --

A. Uh-huh (affirmative).

Q. Did it consist of anything more than, "I looked at the can. I reviewed the data that I received, which I have said is not pertinent to these opinions. I read the DOT Special Permit that lists this range. And because the can exploded and there must have been a defect, there had to have been something wrong."

Is that the substance of your conclusion?

A. No. I considered other methods or other reasons why the can would have failed.

Q. What other method -- what other reasons did you consider?

A. The thickness, which I checked. The fact that the can could have struck something, like, sharp. Or been, I don't know, impacted into something and that caused the can to explode. Looked at, like we talked about, the double seam.

I think I might have missed one or two, but that kind of covers it at a bit high level.

Q. But you ran no testing to -- besides measuring the thickness, I suppose, you didn't run any other tests or employ any other methods to rule out those conclusions? To

30 (Pages 117 to 120)

Page 121

rule out those alternatives?

A. I ruled out other hypotheses based on the deposition testimony that I read.

Q. But not testing that you performed yourself?

A. No.

Q. Despite being in possession of the can?

A. Correct. I can't test the can to see if somebody hit it on something sharp.

Q. You could do a more granular metallurgical analysis of the can to investigate how it actually failed, couldn't you?

A. Yeah. But that doesn't change the answer. It doesn't change my opinion. I thought Mr. Dee was off on his comment there.

I mean, yes, depending upon what you're trying to get at in the case, it could make sense to look at the metallurgy to see if there is some type of a metallurgical defect. But if it's what caused the can to fail, the can failed when it shouldn't fail. People don't buy a package expecting it to burst on them, and it's not supposed to burst on them. Like we talked about before, it's supposed to be fit for use.

Q. Sure -- and I understand that.

What I want to understand from you, is that you have opined that there is a defect in this can. The reason that

Page 122

you've opined that there's a defect in this can is, well, it burst and it wasn't what -- it shouldn't have burst due to this permit, and then nothing else.

A. Well, I opined that the can was defective, and my belief is that the metal pulled out of the double seam.

Q. But what you've also told me, for the past going on three and a half hours now, is that "I don't actually know what happened with the manufacture of this can, because I haven't looked at the data and you didn't give it to me."

A. No. I didn't say that.

Q. Okay. How do you know, without consulting the data, without performing any testing, what the manufacturing defect in this can was?

A. Through the specifications it's supposed to meet and through my analysis of the failed can.

Q. What specifications do you believe were not met?

A. That the can is not supposed to burst below 480 PSI. Or if it goes over 380 PSI, that the pressure relief device is supposed to activate.

Q. And so, that -- that's the answer then, is that because this happened, there had to have been a defect? Is that your opinion?

A. There was a defect.

Q. But you haven't been able to articulate it or

Page 123

show any data to support that defect, fair?

A. No. I said I believed the metal pulled out of the double seam. And I went through an explanation of that.

Q. I think what we have here is just really a chicken and the egg argument, right? And maybe I'm not doing a good job of expressing it.

But what I want to know, is how can you say, with a reasonable degree of certainty, that there is a defect when you do not have the data underlying it to illustrate what that defect is?

A. I have data. I never said I didn't have data.

Q. Well, what is your data?

A. I have -- I talked about it before. I talked about the length of the metal I pulled out of the double seam.

Q. Well, let's just -- you say, "It is highly likely the can failed by the can body metal pulling out of the double seam, causing the can to violently explode and tear apart."

And that's what you say about the double seam?

A. Correct.

Q. And what you say here, under Section 11 of your report, is that you "Requested double-seam data for the day the failed can was made and for several days before and

Page 124

after the can was made. And the data was not provided to me by the defendant. Thus, I was not able to determine if good double seams were being made or not."

A. Correct. Looking at that double-seam data, I could not determine. I could determine in other ways, but not from that data.

Q. And so, you can determine that the double seam failed -- well, strike that.

How -- what other ways can you determine that there was a defect in the double seam?

A. By looking at the amount of metal that pulled out of the double seam.

Q. Your very last opinion is, you say, "The can failed because it was defective, and the defendant has provided no data to demonstrate the cans were being manufactured properly."

A. I would include double seaming as part of the manufacturing process.

Q. Right. And I think that's -- what measurements did you take of the double seam?

A. All I could see was the overall height of the double seam and the width. And then, I tried to get information off the CT scan, and I was not able to.

Q. Okay.

A. So the only other thing I had was the length of

Page 125

the metal that pulled out of the double seam.

Q. And how long was that length of metal?

A. I don't recall the exact number. I don't think I put that in my report.

Q. I can tell you did not. You didn't think that was important to put in your report, if that's your basis for saying there's a defect?

A. No.

Q. Okay.

A. Because nobody can say exactly how much metal should pull out and shouldn't pull out.

Q. Right.

A. I've tested hundreds and hundreds of cans that have failed in the sidewall or in the double seam, and I know what those failures look like.

Q. The question is, you know what those failures look like. How do you attribute that to an error in the manufacturing process versus something that happened in the one and a half years that this product was out in the marketplace? When you do not have the manufacturing data and have represented, in your report and in this deposition, that it is the most pertinent information and the most important information and the most critical information in understanding the manufacturing process?

A. It is. Of the data that they normally collect,

Page 126

it is the most important. They don't collect data on how much of a double seam pulls out when it fails. That's not data that's available.

Q. Uh-huh (affirmative).

A. Yes. I would have loved to have that other data, but I didn't get it. So I did my analysis without it.

Q. Are you a certified explosion -- fire and explosion investigator?

A. No.

Q. Did you attempt to conduct an explosion reconstruction of this product?

A. No.

I'll add, I'm a packaging expert, I'm a metal packaging expert, and I'm a double-seaming expert. That's why I think I'm qualified.

Q. Do you know what NFPA 921 is?

A. Not until I saw Dr. Dee's report.

Q. Did you perform any investigation in h with that standard?

A. My methodology was similar to what I read when he brought that up in his report.

Q. We've heard -- I've -- we've both used the word "methodology" a lot, and I'm still having a hard time --

A. My -- my approach --

Q. -- of understanding --

Page 127

A. The process I went through --

Q. Yes.

A. -- was very similar to what he quotes as whatever it is, NFP -- I don't remember the numbers. But I've -- I had not heard of that term until I read his report, so I looked it up and saw how it classified the process or methodology, and what I did was very similar to that.

Q. Which was a visual inspection.

A. No, no, no. I'm talking about the whole process.

Q. Okay.

A. Identification of the need, the fact that Mr. Boatright got hurt, that a can exploded, gathering the data, analyzing the data, forming hypotheses, that type of a process. That's what I would call "methodology."

Q. I think I've already asked you this, but I just want to be clear.

Do you have any measurements relating to the length, the thickness, any other attribute of the double seam which you attribute as the defect in this case?

A. I don't have a number that I can provide right now. No.

Q. The -- we've focused a lot on the double seam. We've kind of thrown away the PRD device, or the pressure relief device.

But in your -- in your report, it said the pressure

Page 128

relief device was defective?

A. If the pressure was above 380.

Q. Well, you tell me, in your report, in these conclusions, where you opine that the double seam is the defect and not the pressure relief device.

And we can read through your conclusions, the ones that are not factual assertions. You say --

A. I said if the pressure was 380 or more, then the PRD should have activated, and it did not. And therefore, it would have been defective.

The can is not supposed to burst below 480 PSI, and it did. We know -- well, we know it burst. We don't know at what pressure it was. And I'm saying, for it bursting, based on my examination of the can, the most likely explanation is that the double seam pulled apart.

Q. Okay. I'm going to show you what we've marked as Exhibit 6. And these are your timesheets that were produced to us a few days ago.

And what I am wanting to look at is your time for August and September of 2025 -- well, actually, strike that. It's October of 2025. The title says August, September, but the entries say October.

A. Oh, I'm -- yep. I frequently do that.

Q. October 19th of 2025 is your first entry for obtaining possession of the can.

Page 129

A. Yes.

Q. And you can go back and crosscheck me on that.

A. No. I -- I believe you.

Q. Did you physically examine this can before that date?

A. Before that date?

Q. Yes.

A. No. Not the actual sample itself. I likely saw pictures of it.

Q. Uh-huh (affirmative). Then you have a time entry on October 21st of 2025. The description is, "examined failed can, generate questions."

A. Uh-huh (affirmative).

Q. Your entry is .25 hours.

A. Yes.

Q. And that's 15 minutes, right?

A. Yes.

Q. How long did you actually spend examining this can?

A. I couldn't give you a number. I've looked at it multiple times, and I probably didn't log it into my time sheet every time.

Q. When did you take the measurements of the can that we talked about earlier?

A. I can't give you an exact date, but it -- it

Page 130

would most likely be some time shortly after I received it. So my -- my guesstimate would be in October.

Q. And you don't know how long you actually spent examining the can itself and performing --

A. No. I looked --

Q. -- collecting measurements on it?

A. No. I looked at it multiple times.

Q. I'm just going to ask you some jury qualification questions, and that should be it for me.

Do you -- were you -- go ahead?

BY MR. TUTEN:

Q. Where are you currently living at?

A. County or city or --

Q. The county is fine.

A. Address?

Q. The county is fine.

A. Of Fulton -- Fulton County.

Q. Have you ever lived anywhere in South Georgia?

A. No.

Q. Do you -- are you married?

A. Yes.

Q. What's your wife's name?

A. Catherine (ph).

Q. Where is Catherine from?

A. Like, where did she grow up? Or where does she

Page 131

live now?

Q. Both.

A. She grew up in Minnesota, and she lives with me in Alpharetta, right now.

Q. Do you have any adult children?

A. Yes.

Q. Do any of them live or work in South Georgia?

A. No.

Q. Do any of them live in Georgia, period?

A. Yes. They both do.

Q. Are they in the Atlanta Metro area?

A. Metro area. Yes.

Q. Okay. Do you have any relatives of any kind -- I'm about to give you a couple of counties here, but they're all within the venue of this court, so -- Atkinson County?

A. No.

Q. Any relatives there?

A. And when I tell you "no," it's not that I know of.

Q. That's fine.

A. Yeah.

Q. No one that would know you?

A. No. No.

Q. Yeah.

Page 132

A. Correct.

Q. Macon County?

A. No.

Q. Brantley County?

A. No.

Q. Charlton County?

A. No.

Q. Coffee County?

A. No.

Q. Pierce County?

A. No.

Q. Ware County?

A. No.

Q. Are you a member of any religious organizations?

A. Loosely.

Q. Which -- which ones?

A. Lutheran Church.

Q. Lutheran Church?

A. Yeah.

Q. How about any civic or professional associations or organizations we haven't talked about?

A. NRA.

Q. Anything else?

A. No. Is that the type of -- you want?

Q. Yeah. Yeah. That's fine.

Page 133

A. Yeah. I just joined that this year.

Q. We're just -- what we don't want to have is a, you know --

MR. FUTCH: I think we're safe on --

BY MR. TUTEN:

Q. Yeah. I think so, too. We don't want to be picking a jury and put your cousin on it --

A. Oh, okay.

Q. A guy that's on the board of directors with you.

A. I've never had these questions before. So, I didn't -- yeah.

Q. Okay.

MR. FUTCH: I think we're safe here.

MR. TUTEN: Yeah. I think so, too.

THE WITNESS: Okay.

MR. TUTEN: That's all the questions I have for you right now. I might have some more in a minute, but --

THE WITNESS: Okay.

MR. TUTEN: I'm happy to hand off to Sean, if he's ready to go.

MR. SWANSON: Anyone need -- does anyone need a break or anything?

THE WITNESS: No, I'm okay. If --

MR. TUTEN: I'm okay as well.

Page 134

CROSS EXAMINATION

BY MR. SWANSON:

Q. All right. Well, let's keep it rolling. Mr. Biondich? Did I say that right?

A. Yes.

Q. All right. I -- I phonetically spelled out your name a while ago, so I -- mess that up. So --

THE WITNESS: Could we turn up the volume a little bit? One second.

THE COURT REPORTER: I'm thinking -- move it closer.

THE WITNESS: One second.

THE COURT REPORTER: Move it closer -- okay?

THE WITNESS: Or is that -- yeah. Move it closer to him.

THE COURT REPORTER: It might go up. I don't know.

THE WITNESS: I don't have the greatest hearing. Okay.

BY MR. SWANSON:

Q. Is this a little better for you, sir?

A. Yes.

Q. Okay. Good. I'm obviously here by Zoom in this deposition, so if there is anything additional that you can't hear or understand, or I freeze up or anything, if

Page 135

you'll just let me and the folks in that room know, we'll kind of reset things for you. Okay, Mr. Biondich?

A. Okay.

Q. Great. My name is Stephen Swanson. My law firm represents the Defendant in this case, Discount Auto Parts, Inc. You ever worked for a -- well, I'll represent to you that that's the company that operates the Advance Auto Parts store.

Is that your understanding as well, sir?

A. Could you -- sorry, could you repeat it?

Q. I said, my -- I'm -- I said my law firm represents the Defendant in this case, by the name of Discount Auto Parts, Inc.

Do you agree with that?

A. Yes.

Q. Okay. Well, you know --

A. Well, I guess I do. I don't know you, so I don't know who you work for. But I agree that Discount Auto Parts is involved in this case.

Q. All right. What do you know about Discount Auto Parts, Inc.? Anything?

A. No. Just what I would know as a consumer of auto parts.

Q. You understand Discount Auto Parts, Inc., to have some affiliation with the selling of auto parts; is that

Page 136

right?

A. Yes.

Q. Is there a particular brand or store of brick and mortar that you understand Discount Auto Parts, Inc. to be affiliated with?

A. Are you asking me, like, if I think they're part of Advanced Auto Parts?

Q. Is that what you understand?

A. That's what I understand. Yes. I'm not sure if that's true or not, but that would be my understanding right now.

Q. Your report in this case, Mr. Biondich, is contained -- let's see. -- date on this?

Your -- your report and observations in this case is dated November 17th, 2025; is that right?

A. I believe so. Yes.

Q. It's -- I don't know, a dozen-or-so-page document you put together with all of your conclusions that you've been talking about with the other attorney in the room for the last few hours, right?

A. Yes.

Q. Is there any other document that exists, that you know of, that would have any other opinions that you have, in this case, other than this document that's dated November 17th, 2025?

Page 137

A. No.

Q. Okay. Good. We don't have to go out into the world of finding those documents or wonder if they exist.

A. Yeah.

Q. The report that's dated November 17th, 2025, it focuses on the design, manufacture, and failure of the aerosol container, the can, right?

A. Generally, yes.

Q. Okay. And your background is in packaging, engineering, and metal packaging, right?

A. Packaging in general, and metal packaging as a specialty.

Q. Okay. Your expertise and background is not in retail operations or the duties of retail stores; is that right?

A. Correct.

Q. Have you ever worked at an Advance Auto store?

A. I have not.

Q. Do you understand Advance Auto is a retailer that purchased this particular aerosol can from Energizer to resell to its customers?

A. Yes.

Q. And when I say -- can we agree that when I say, "Advance Auto," I'm using that term interchangeably with the names of the Defendants, Discount Auto Parts?

Page 138

A. That's fine.

Q. Okay. Do you agree that Discount Auto did not manufacture this can?

A. I haven't seen anything related to who manufactured the can.

Q. You haven't seen anything on a piece of paper or conversation that affirmatively says that Discount Auto manufactured the can, is that right?

A. I haven't seen anything that said they made it, no. But I -- I don't think I've seen anything that said who made the can.

Q. Okay. You haven't seen anything that indicated Advance --

A. Well, it may have been in Mister -- it may have been in Mr. Dee's report. That might have been the first time I -- I saw it listed.

Q. In Mr. Dee's -- and in that report you're referring to, it -- do you recall --

A. His --

Q. -- it saying that -- in that report you're referring to, you recall it saying that Discount Auto manufactured the can?

A. No. That somebody else manufactured the can.

Q. Somebody else, not Discount Auto, also known as Advance Auto?

Page 139

A. Correct.

Q. Okay. So, you have seen a document that indicates that Discount Auto did not manufacture the can; is that right?

A. I've seen it stated in a -- in Mister -- or Dr. Dee's rebuttal of my report, where he said he believes the can was made by ITW Sexton.

Q. And as you sit here today, do you have any information, documents, or opinions that -- that that conclusion is incorrect, that ITW Sexton was the manufacturer of the can?

A. I have no data relative to who made the can.

Q. Okay. You don't have any information, documents, or expert opinion that Discount Auto filled the can with whatever substance was inside the can, right?

A. No. I don't believe Discount Auto fills the cans.

Q. You don't have any opinions, documents, or information or evidence that Discount Auto designed the can?

A. I have no information about who designed the cans.

Q. Do you have any information, documents, opinions, testimony that Discount Auto had any hand in any step of the manufacturing process of this particular aerosol can?

Page 140

A. I don't think I have any data related to who manufactured the can.

Q. This would include the double -- the double seam -- the double-seaming --

A. I don't know -- right. I don't know who -- I don't know who formed the double seam.

Q. Okay. Do you offer any opinions in your report about any actions or omissions by Discount Auto Parts, whether in selling, storing, or handling the product?

A. No.

Q. I didn't see in your report that you --

A. But I don't think -- well, let me back up. Sorry, I don't think that's what I'm an expert on either, which is why I didn't render any opinions in that space.

Q. Okay. Limited to your expertise, knowledge, and your involvement in this case and your retention in this case, is your answer any different from what you told me before?

A. No.

Q. Okay. I didn't see in your report that you criticized Discount Auto for anything it did as a retailer. Is that right? Or did I miss something somewhere?

A. I'm thinking this through.

Q. Okay.

35 (Pages 137 to 140)

Page 141

A. I --

Q. Sure. Take your time.

A. No. I did not criticize them within my report. I was just kind of taken aback by your question. I don't -- because that doesn't feel like that's my role.

Q. Of the -- whatever your testimony was of -- as to why the can was defective, the double seaming or the placement of the PRD, what -- whatever --

A. Right.

Q. -- your ultimate conclusions are as to why the can was defective, you would agree that those things would have existed when the can left the manufacturer's control and not when it left the auto parts store, right?

A. I have no way of knowing about the can's history.

Q. Is -- is -- do -- do you have any information or knowledge or understanding of whether an Advance Auto Parts store performs any aerosol can double sealing within its brick-and-mortar premises before they put the can on the shelf?

A. Not that I'm aware of.

Q. Are you aware of -- are you aware of whether Advance Auto stores are performing any PRD valve placement on aerosol cans before they stick them on the shelves for sale --

A. No. No.

Page 142

Q. Is it more likely than not that if the double seaming was mismanufactured or misinstalled or misapplied to this particular can, that would have happened at the manufacturing level?

A. Yes.

Q. Is it more likely than not that if the PRD, the pressure relief device, was on -- was put on the can, not as it should have been, is it more likely than not that -- that would have been done at the manufacturing stage of this can's life?

THE WITNESS: Can I ask Ken a question?

MR. TUTEN: Yeah.

THE WITNESS: Pardon me?

MR. TUTEN: Yeah, ask him.

THE WITNESS: I don't --

BY MR. SWANSON:

Q. Do you want to ask me a question?

A. Well, I -- I -- I don't understand why you're asking me, "Is it more likely than not?" I guess, what --

Q. Do you not understand my question? Or do you need me to repeat it or rephrase it? Is that the problem?

A. I think I need you to repeat your last question.

MR. SWANSON: Okay. Can the Court Reporter read it back, if you have it?

(Whereupon, a discussion ensued off the record.)

Page 143

BY MR. SWANSON: (Resuming)

Q. Sure. You, at some point prior to today, were talking about the pressure relief device on this particular can, right?

A. Yes.

Q. You had some testimony about it being somewhere that it shouldn't have been; is that right?

A. No.

Q. Okay.

A. It was -- it was where it was supposed to be, based on the patents that I read. Or the patent, I should say, singular.

Q. Okay. It was defective because it didn't -- it didn't perform like it was supposed to in terms of the pressure it was supposed to account for; is that right?

A. If the can experienced a pressure greater than 380 PSI, the PRD did not activate. Therefore, the can was defective.

Q. Okay. And the reason for the PRD not activating is what? Or you don't know?

A. I don't know. I don't know if we got above 380 or not.

Q. Okay. And the non-activation of a PRD, would that be something that is tied to the seller of the can or the manufacturer of the can, more often than not?

Page 144

A. Are you asking me, like, who made it or who has legal liability? I don't -- this is where I'm getting confused by your line of questioning. I mean, I'm not a legal expert. I don't know what company has responsibility for what.

Q. Well, do you have an opinion in this case as to whether the PRD not activating is associated with the conduct of Defendant Energizer or Defendant Discount Auto? Is there an opinion that you have in that regard?

A. I don't think I rendered an opinion as to who.

Q. All right. And do you have one here today, as I'm asking you the question?

A. I'm not sure who that responsibility lies with.

Q. Okay. In your report, did you offer any opinions that Discount Auto Parts knew or should have known about whatever you believe was going on -- the inside of this can?

A. No.

Q. As you sit here today, do you have an opinion that Discount Auto should have known what was going on in that can?

A. I'm not a hundred percent sure how to answer that.

Q. In this case, were you asked to evaluate whether Discount Auto Parts had any knowledge of defects that you

Page 145

believe were associated with the can?

A. No. I don't think I was asked that specifically.

Q. Do you know how long the can was sitting on the shelf before it got purchased and used in the incident we're here about today?

A. No.

Q. Do you know of -- or do you have any opinion or information that the can had experienced any type of malfunction prior to its interaction with the plaintiff and the employees at the store?

A. No, I have no --

Q. --

A. No -- no information in that regard.

Q. Okay. I think you said somewhere in your report that there was a -- there was an Advance Auto Parts manager nearby when this happened, right?

A. Yes.

Q. Okay. Is your -- is there an opinion in here somewhere that I missed that that person did anything wrong or contributed to this can failure at all?

A. I do not have any opinion about that.

Q. Okay. You're aware the plaintiff in the case had testified that he's purchased these products in the past -- these particular -- in the past?

A. Yes. I believe I read that in his deposition

Page 146

transcript.

Q. Do you know if he's had problems with other similar cans in the past?

A. I don't know either way.

Q. Do you offer any opinion in this case on whether the plaintiff relied on any Discount Auto employee in selecting this product, do you?

A. There's conflicting stories there. Mr. Boatright said he got --

Q. What --

A. Pardon me?

Q. I thought you were done.

I was going to say, what are the stories that you know --

A. Well, Mr. Boatright said in his deposition that he tried a second can, and that was given to him by the auto parts store manager. And the auto parts store manager, in their deposition, said that Mr. Boatright selected the can himself.

Q. Okay. Is the -- are you -- do you -- are you making an opinion here that the picking up of a particular can on the shelf has anything to do with its ultimate PRD non-activation and the whole seam pulling apart?

A. No. I believe Ben asked me a similar question, and I said that doesn't -- either their stories or

Page 147

whatever, however you -- both of their stories would lead me to the same opinions.

Q. And so, the --

A. It -- it was there --

Q. --

A. It was -- it was -- however you say it, immaterial -- ill-material, ir-material? I don't know what the word is.

Q. Immaterial?

A. Immaterial. Thank you. Yes.

Q. Okay. In other words, someone walking to the aisle in the Advance Auto store, putting their hand on a particular can and handing it to the plaintiff for use, was not related to the can's defective nature; is that right?

A. Correct.

Q. Have you investigated these cans before?

A. EZ Chill cans?

Q. Yes.

A. No.

Q. I mean, I'm just trying to think, like, when I have had -- when I defend cases about, I don't know, with cars and tires, you know, exploding or something. There's normally, like, a government database that captures all these complaints about tires exploding.

Is there a similar kind of database, somewhere, where

Page 148

folks are lodging complaints about particular products that you know of?

A. Yes. But those are typically cataloged by the brand owner. So normally, the consumer would go file a complaint directly with -- with the -- the company that -- whose name is on the can.

Q. Oh, okay. Was Advance Auto Parts' name on this can at all, that you know of?

A. Not that I'm aware.

Q. Was the name Discount Auto Parts, Inc. on the can anywhere that you know of?

A. Not that I'm aware.

Q. Were you -- do you have experience, or do you have knowledge or information, or have talked to people about this particular can exploding in similar ways before, anywhere else that you've heard?

A. Not this particular -- you mean EZ Chill, again? Have I --

Q. Yeah. Whatever the thing is that exploded in this case, have you --

A. I mean, I've --

Q. -- heard that that's what happened before, anywhere?

A. I'm aware of other aerosol cans exploding. I'm not aware of any other EZ Chill aerosol cans exploding.

37 (Pages 145 to 148)

Page 149

Q. And similarly, in your line of work investigating this packaging and -- and root cause of -- of these failures, is Advance Auto Parts a common name that comes up in your work as selling products that fail --

A. No.

Q. -- were sold?

A. No.

Q. No. Have you ever done any work investigating things sold to customers by Advance Auto Parts?

A. I may have, but I don't know for sure. I've dealt with some other automotive products in aerosol cans, but I don't know where they were sold.

MR. SWANSON: That's all the questions I have. Thank you, sir.

THE WITNESS: You're welcome.

MR. TUTEN: Ken, you got anything?

MR. FUTCH: No.

MR. TUTEN: I got two minute's worth.

MR. FUTCH: Okay. I -- set my timer, here.

RECROSS EXAMINATION

BY MR. TUTEN:

Q. I'm just trying to be precise.

Is your -- do you have an -- any opinion that there was a design defect in the subject product?

A. I don't know.

Page 150

Q. You've -- well, do any of your opinions that you've rendered, in this case, express that there's a defect in the design of the product?

A. I don't know.

Q. As compared to a defect in the manufacture of the product?

A. I don't know.

Q. So, your opinion is that there is a defect, period. You don't know whether it is a design defect or a manufacturing defect?

A. Correct.

Q. Because you don't have access to the underlying data?

A. Correct.

MR. TUTEN: That's all the questions I have. deposition.

MR. FUTCH: Yes, ma'am.

THE COURT REPORTER: Okay.

(Whereupon, the deposition in the above-entitled matter was concluded at 1:56 p.m.)

Page 151

DISCLOSURE

STATE OF GEORGIA     DEPONENT: SCOTT C. BIONDICH

COUNTY OF FULTON

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as an independent contractor for Wheeler Reporting Company, Inc.

Wheeler Reporting Company, Inc. was contacted by the offices of OLIVER MANER LLP, to provide court reporting services for this deposition. Wheeler Reporting Company, Inc. will not be taking this deposition under any contract that is prohibited by O.C.G.A. Sec. 9-11-28 (c).

Wheeler Reporting Company, Inc. has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition. Wheeler Reporting Company, Inc. will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

Jasmine Ingram, CCR
Certified Court Reporter
License No. 5073-5740-4699-0336

Page 152

CERTIFICATE

STATE OF GEORGIA

COUNTY OF FULTON:

I hereby certify that the foregoing deposition was taken down, as stated in the caption, and the colloquies, questions and answers were reduced to typewriting under my direction; that the foregoing transcript is a true and correct record of the evidence given.

The above certification is expressly withdrawn and denied upon the disassembly or photocopying of the foregoing transcript, unless said disassembly or photocopying is done under the auspices of Wheeler Reporting Company, Inc., Certified Court Reporters, and the signature and original seal is attached thereto.

I further certify that I am not a relative or employee or attorney of any party, nor am I financially interested in the outcome of the action.

This, the 12th day of March, 2026.

Jasmine Ingram, CCR
Certified Court Reporter
License No. 5073-5740-4699-0336

Page 153

ERRATA SHEET

SCOTT BIONDICH 02/11/2026/JI

I have read the within and foregoing pages numbered 5 through 150 and no changes are required:

This, _____ the day of _____, 2026.

_____

SCOTT BIONDICH

Sworn to and subscribed before me, this ____ day of _____, 2026.

_____

Notary Public

- - -

I have read the within and foregoing pages 5 through 150 and the following changes are required as a result of the transcription thereof:

Page ____ Line ____: _____
Page ____ Line ____: _____
Page ____ Line ____: _____
Page ____ Line ____: _____
Page ____ Line ____: _____
Page ____ Line ____: _____
Page ____ Line ____: _____
Page ____ Line ____: _____
Page ____ Line ____: _____
Page ____ Line ____: _____

Page 154

Page ____ Line ____: _____
Page ____ Line ____: _____
Page ____ Line ____: _____
Page ____ Line ____: _____
Page ____ Line ____: _____
Page ____ Line ____: _____
Page ____ Line ____: _____
Page ____ Line ____: _____
Page ____ Line ____: _____
Page ____ Line ____: _____
Page ____ Line ____: _____
Page ____ Line ____: _____
Page ____ Line ____: _____
Page ____ Line ____: _____
Page ____ Line ____: _____
Page ____ Line ____: _____
Page ____ Line ____: _____

_____

SCOTT BIONDICH

Sworn to and subscribed before me, this ____ day of _____, 2026.

_____

Notary Public